UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RUBEN SALUSTIO and ARTURO VIVALDO, *individually and on behalf of others similarly situated*, | : |
| | : |
| | : |
| | :   Docket No. <u>15 CV 6857 (WHP)(GWG)</u> |
|          *Plaintiffs,* | : |
| | : |
|    -against- | : |
| | : |
| | : |
| 106 COLUMBIA DELI CORP. (d/b/a COLUMBIA DELI), 934 GROCERY CORP. (d/b/a MARIO'S GOURMET DELI), 106 KINGS GOURMET DELI INC. (d/b/a COLUMBUS GOURMET DELI), COLUMBUS GOURMET FOOD CORP.I (d/b/a COLUMBUS GOURMET DELI), MUHAMMAD ALHAGAGI, IBRAHIM ALZUBAIRY, ARDIA RODRIGUEZ, AND CAMAL AL FAQIK | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
|         *Defendants.* | : |
| | : |
| | : |
| | : |

## <u>DEFENDANTS' POST-TRIAL BRIEF</u>

BY: THE ANTONIOUS LAW FIRM
Jacqueline S. Kafedjian, Esq.
*Attorney-for-Defendants*
62-26 Myrtle Avenue,
Suite 105
Glendale, NY 11385
Tel: (718) 456-5500
Fax: (718) 335-8369
jackie@antoniouslawfirm.com

<u>TABLE OF CONTENTS</u>

STATEMENT OF THE FACTS……………………………………………………..3

ARGUMENT…………………………………………………….………………...11

**I.**    **This Court lacks original jurisdiction regarding Plaintiffs' federal claims, where there is neither enterprise coverage nor individual coverage under the FLSA** …………………………………………………….........................11

    *i.*   *Ruben's incredulous claims regarding 106 Columbia's daily gross receipts*...................12
    *ii.*  *106 Columbia was not an enterprise engaged in commerce pursuant to the FLSA*……..14

**II.**   **This Court should decline to exercise supplemental jurisdiction over the state law claims because the Plaintiffs have raised an incredulous issue of material fact regarding daily revenues in order to force a trial on the matter, and any resulting inconvenience in retrying the matter in state court is of the Plaintiffs' own doing**………….......................................................................................16

**III.**  **The Plaintiffs' testimonies regarding the dates of employment, hours, and pay were contradictory and lacked credibility**………………………………….19

**IV.**   **All employees maintained a fixed schedule, wherefore the Defendants complied with their hourly record-keeping obligations pursuant to 29 CFR §516.2(c)**……...22

**V.**    **Ruben has failed to demonstrate that he worked any hours for which he was not properly compensated.  He was paid a lawful minimum wage for all regular hours worked, and a lawful overtime rate for all hours worked over 40**…..23

**VI.**   **Arturo was paid a reduced minimum wage based on the good faith belief that he was properly classified as a tipped employee**……………….....………....……24

**VII.**  **Plaintiffs have failed to demonstrate that they worked a spread of hours ten hours or longer on any day worked**…………………………………………...25

**VIII.** **Defendants are entitled to a credit for meals provided to Plaintiffs, and the bona-fide 30-minute breaks during the Plaintiffs' shifts should not be compensated** …………………………………………......…………...……26

**IX.**   **Plaintiffs failed to demonstrate that Defendants acted with any willfulness to violate the FLSA, wherefore a two-year statute of limitation is applicable**……...…27

**X.**    **Defendants acted with a good faith belief that they were in compliance with the FLSA and the NYLL, wherefore this Court should not impose liquidated damages**………………………………...…………………………29

The Defendants 106 COLUMBIA DELI CORP. (d/b/a COLUMBIA DELI) (hereinafter "106 Columbia") and IBRAHIM ALZUBAIRY (hereinafter "Ibrahim") hereby submit this post-trial brief in support of a dismissal of Plaintiffs' claims for lack of jurisdiction and/or a judgment in favor of Defendants.

The Plaintiffs RUBEN SALUSTIO (hereinafter "Ruben") and ARTURO VIVALDO (hereinafter "Arturo") are brothers-in-law who have raised suit against various different grocery-delis located in the same neighborhood in the Upper West side.  Plaintiffs allege causes of action for: (1) Violation of the FLSA Minimum Wage Provisions; (2) Violation of the FLSA Overtime Provisions; (3) Violation of the NYLL Minimum Wage Act; (4) Violation of the NYLL Overtime Provisions; (5) Violation of the NYLL Notice and Recordkeeping Requirements; (6) Violation of the NYLL Wage Statement Provisions; and (7) Violation of the SOH NY Wage Order.

A trial was held in this matter on June 12, 2017 before the Honorable Gabriel Gorenstein.

## STATEMENT OF THE FACTS

### *Defendants Ibrahim Alzubairy and 106 Columbia*

Ibrahim is the President and 100% shareholder of 106 Columbia, located at 945 Amsterdam Ave., New York, NY 10025.  (Tr. 48, Ln. 22-25; Tr. 49, Ln. 1-3; JPTO Stip of Fact #3.)  Ibrahim bought the business in December 2010, at which time 106 Columbia was incorporated.  (Tr. 49, Ln. 21-24.)  Ibrahim exercised the sole authority over his business, and he was responsible for operation, management, and finances of 106 Columbia.  (Tr. 49, Ln. 19-20; Tr. 50, Ln.2-5, 14-16; Tr. 57, Ln. 8-13.)  106 Columbia was in business about four and a

half years, although it was not profitable.  (Ex. A, Federal Income Tax Returns 2010-14.)  The business was sold in June 2015.  (Tr. 49, Ln. 4-17.)

Ibrahim reviewed, filed and signed the Form 1120 federal corporate income tax returns on behalf of 106 Columbia.  (Tr. 52, Ln. 8-13.)  To prepare these yearly returns, Defendants provided their business records to their accounting firm to prepare the returns on their behalf.  (Tr. 52, Ln. 14-15; Tr. 81, Ln. 9-15; Tr. 82, Ln. 9-14.)  In the corporate calendar years from December 1st through November 30th in the years beginning 2010, 2011, 2012, and 2013, 106 Columbia grossed less than $500,000 per year, exclusive of excise tax. (Ex. A; Tr. 53, Ln. 12-19; Tr. 55, Ln 1-16.)  106 Columbia's gross receipts were as follows:

> December 1, 2010 – November 30, 2011: $214,000
> December 1, 2011 – November 30, 2012: $289,372
> December 1, 2012 – November 30, 2013: $320,375
> December 1, 2013 – November 30, 2014: $374,461

(Ex. A at pp. D001, D008, D024, D036, Line 1a)

On 106 Columbia's federal returns, an error was discovered regarding the deduction taken for the store's rental expense, which was stated lower than the actual rent paid by 106 Columbia during the period. (Tr. 55, Ln. 17-25; Tr. 56, Ln. 1-5; Ex. A at pp. D001, D008, D024, D036, Line 16.)  This error, however, did not affect the computation of gross sales reported on each of the returns or the tax owed, since the business operated at a loss for the years in question, and further deductions were moot.  (Ex. A at pp. D001, D008, D024, D036, Line 30.)  Because the error was moot, Defendants were advised by their accounting firm that an amended return was unnecessary.  (Tr. 56, Ln. 6-22.)  At trial, the Plaintiffs presented no exhibits to rebut the Defendants' tax returns or gross sales.

106 Columbia is a deli grocery that sells prepared foods, beverages, and groceries.  (Tr. 6, Ln. 4-8; Tr. 27, Ln. 1-4; JPTO Stip of Fact #3.)  Ibrahim was present at the store every day

from 10 – 14 hours per day, sometimes leaving as late as 4:00 am.  (Tr. 56, Ln. 23-25; Tr. 74, Ln. 22-25; Tr. 75, Ln. 1-10.)  106 Columbia maintained a weekly written Pay/Time Log of employee hours and pay, which recorded the: (i) weekly dates worked; (ii) start-time; (iii) break-time; (iv) end-time; (v) total regular hours; (vi) total overtime hours; (vii) regular rate of pay; (viii) overtime rate of pay; (ix) total pay; and (x) date paid.  (Tr. 57, Ln. 14-18; Ex. B, Salustio Pay/Time Log; and Ex. C, Vivaldo Pay/Time Log.)  Ibrahim recorded the employee information daily on sheets of paper, which he transferred to the Pay/Time Log at the end of each week when he paid employees, at which time he calculated the weekly totals.  (Tr. 90, Ln. 21-23; Tr. 97, Ln. 2-13, Tr. 98, Ln. 22-25; Tr. 99-100.)

106 Columbia's employees were on a fixed schedule, and shift hours did not vary.  (Tr. 84, Ln. 20-21.)  No employee worked more than 9 hours per day.  (Tr. 66, Ln. 3-7.)  Employees took a 30-minute lunch break that was paid.   (Tr. 86, Ln. 12-16; Ex. B; Ex. C.)  Employees were paid in cash.  (Tr. 8, Ln. 16-18; Tr. 30, Ln. 9-10.)  Employees also had the benefit of free food and drink at the store, including lunch and dinner meals during their shifts.  (Tr. 61, Ln. 15-16; Tr. 62, 6-11.)  The types of meals provided included those typically found at a deli, including: all types of hot and cold prepared foods, e.g. deli meats, cheeses, cold sandwiches, chicken, burgers, wings, muffins, bagels, salads, candy, sides, sodas, iced teas, juices, energy drinks, coffee, and flavored juice beverages.  (Tr. 61, Tr. 17-18; Ex. D, 106 Columbia Menu.)  Sandwiches cost an average of $6, and meals cost on average about $7 each.  (Tr. 21, Ln. 17, Ex. D.)

***The Plaintiffs***

The Plaintiffs Ruben and Arturo are brothers-in-law who lived together while working at 106 Columbia between 2013 and 2014.  (Tr. 9, Ln.17-24; Tr. 36, Ln. 6-8.)  They also lived with a third brother-in-law, Raoul, who was also working as a deli-man for 106 Columbia at the same time.  (Tr. 33, Ln. 12-14, 25; Tr. 34, Ln. 1-11, 19, 20-23.)  Although Raoul worked there until January 2014, he has not raised suit against the Defendants for any unpaid wages. Moreover, even though Raoul worked the same shift as Arturo for one year, he did not appear as a witness at trial to corroborate his testimony.  (Tr. 35, Ln. 9-12.)

***Ruben Salustio***

Ruben worked on and off as a deli-man for 106 Columbia from January 10, 2011 to June 7, 2014.  (Tr. 6, Ln. 20-21; Tr. 57, Ln. 23-25; Tr. 58, Ln. 1, 6-7; Ex. B.)  When Ruben was hired by Ibrahim, they discussed his pay, hours, schedule, breaks, and employee meals.  (Tr. 62, Ln. 1-12.)  Ibrahim had a difficult time finding experienced sandwich preparers, so even though Ruben quit on several occasions, Ibrahim rehired him multiple times.  (Tr. 62, Ln. 21-25; 63, Ln. 1-10, 23-25; Tr. 64, Ln. 1; Tr. 70, Ln. 17-25; Tr. 93, Ln. 8-16; Ex. B at D074.) Sometimes Ruben came back looking for a job, and other times it was because Ibrahim was short a deli worker and called up Ruben to cover the deli.  (Tr. 68, Ln. 18-25; Tr. 69, Ln. 1-5; Tr. 91, Ln. 22-25; Tr. 92, Ln. 1-8; Tr. 102, Ln. 13-24.)  When Ruben would come looking for his job back, Ibrahim could not always rehire him immediately, and he would wait until there was an opening to call him back.  (Tr. 103, Ln. 2-8.)

Defendants maintained a Pay/Time Log for Ruben, as described above, throughout his employment.  (Tr. 58, Ln. 10-12; Tr. 59, Ln. 1-4; Tr. 60, Ln. 18-22.)  106 Columbia's records

confirm that Ruben left 106 Columbia and returned many times, with varying employment

periods which Ibrahim recorded:

> January 10, 2011 – March 2, 2011
> December 14, 2011 – March 18 2012
> September 10, 2012 – September 22, 2012
> April 8 2012 – April 20, 2013
> October 14, 2013 – November 2, 2013
> March 12, 2014 – June 7, 2014

(Tr. 91, Ln. 19-20; Tr. 92, Ln. 13-25; Tr. 93, Ln. 1-2; Tr. 93, Ln. 20-21; Ex. B.)  Defendants

have no knowledge where he worked during the months he was not working for 106 Columbia.

(Tr. 91, Ln. 22-24.)

Ruben worked 9-hour shifts from 7:00 AM to 4:00 PM, six days per week and his

schedule never changed throughout his employment.  (Tr. 64, Ln. 2-3; Ex. B.)  Ibrahim was

regularly present in the store when Ruben ended his shift.  (Tr. 60, Ln. 23-25; Tr. 61, Ln. 1.)

Ruben also took a paid daily break from 2:00 PM to 2:30 PM.  and partook in the employee

meals twice per day, for lunch and dinner.  (Ex. D.)  Ibrahim regularly witnessed him take his

daily 30-minute break and partake in employee meals.  (Tr. 61, Ln. 2-9, 12-18.)

Ruben was paid by the hour.  (Tr. 59, Ln. 5-6.)  When he started working, Ruben was

paid a regular rate of $8.50 per hour and an overtime rate of $12.75 per hour for all hours over

40.  (Tr. 60, Ln. 6-10; Ex. B.)  He was given a raise on January 9, 2012, and he was paid $10

per hour for all regular hours worked, and $15 overtime.  (Tr. 60, Ln. 11-17; Ex. B.)  After he

received his raise, on weeks where he worked the full 54 hours, he received $610.  (Ex. B.)  On

weeks he did not work 54 hours, he was paid per the hours he worked, for example:

> Week of 2/07/11 – 42 hours – paid $366
> Week of 12/14/11 – 36 hours – paid $310
> Week of 1/23/12 – 45 hours – paid $475

(Tr. 70, Ln. 7-20; Tr. 71, Ln. 1-14; <u>Ex. B</u> at pp. D069, D074, D078.)  Ruben never worked more than 54 hours per week throughout the course of his employment, and he also never worked more than 9 hours per day.  (Tr. 61, Ln. 19-22; <u>Ex. B</u>.)  Ruben was given a bonus on one occasion, which was recorded in the Pay Log on the week of 12/25/11, where it states he was paid a $200 Christmas bonus.  (<u>Ex. B</u> at pp. D072.)  This was the only Christmas season that he was working at 106 Columbia.

Ruben ceased working for 106 Columbia on June 7, 2014 because he wanted to open a flower business at another deli/grocery in the neighborhood.  (Tr. 69, Ln. 19-24; <u>Ex. B</u>.)  Ruben testified that he planned to start a flower business in August 2014, on or about the time he stopped working at 106 Columbia, leasing space from another named Defendant in this action, Muhammed Alhagagi (hereinafter "Muhammed"), who has not appeared.  (Tr. 6, Ln. 11-19; Tr. 11, Ln. 11-16; Tr. 12, Ln. 1-4.)  His flower store and new employer was located across the street, Mario's Deli located at 934 Amsterdam.  (Tr. 12, Ln. 11-15; Tr. 38, Ln. 15-18; Tr. 39, Ln. 5-6.)  Muhammed was Ruben's employer before and after his tenure at 106 Columbia.  (Tr. 11, Ln. 17-18; Tr. 15; Ln. 14-18.)  Ruben operated the flower business for about one year.  (Tr. 18, Ln. 18-19.)  Then, Muhammed evicted him from the flower shop and fired him sometime in the summer of 2015, which resulted in a fight between them that included an assault on Ruben.  (Tr. 11, Ln. 24-25; Tr. 19, Ln. 10; Tr. 37, Ln. 7-8, 17-19; Tr. 38, Ln. 2-5; Tr. 39, Ln. 12-13.)  This was the catalyst to the Plaintiffs filing their suit shortly thereafter in September 2015, long after they had ceased working for the Defendants.

***Plaintiff Arturo Vivaldo***

After the last time Arturo returned to the US in November 2012, he remained unemployed for over one year, and Ruben helped him out during that period. (Tr. 32, Ln. 12-25, Tr. 33, Ln. 1-5.) Then Arturo got a job with Ruben and Raoul working as a deliveryman for 106 Columbia from March 20, 2013 through March 29, 2014, although the Plaintiffs gave conflicting testimony as to which of the brothers-in-law got him the job. (Tr. 9, Ln. 25; Tr. 10, Ln. 1; Tr. 27, Ln. 11-12; Tr. 58, Ln. 2-5, 8-9; Tr. 72, Ln. 22-24; Ex. C, Vivaldo Pay/Time Log.) When Arturo was hired by Ibrahim, they discussed his duties, hourly rate of $6, hours, schedule, break-times, and employee meals. (Tr. 68, Ln. 4-8; Tr. 94, Ln. 6-25.) Defendants also maintained a Pay/Time Log, as described above, throughout Arturo's employment. (Tr. 58, Ln. 10-12; Tr. 65, Ln. 2-8.) Arturo worked 9-hour shifts from 7:00 PM to 4:00 AM, six days per week. (Ex. C.) Arturo's log indicates that his shift ended at 3:00 AM, but this is incorrect, his shift ended at 4:00 AM. (Tr. 65, Ln. 21-25; Tr. 85, Ln. 12-14; Ex. C.) The log, however, correctly recorded the regular daily hours as 9, days worked as 6, the weekly hours as 54, and the weekly pay as $324 (= $6 per hour x 54 hours per week). (Tr. 66, Ln. 1-2; Tr. 85, Ln. 18-19; Ex. C.)

Moreover, Arturo took a daily break from 10:00 PM to 10:30 PM, which was also not deducted from his pay. (Ex. C.) Although Ibrahim was not regularly present during the end of Arturo's shift and break time, he regularly discussed his hours with him to confirm the times. (Tr. 67, Ln. 6-8, 16-24.) Arturo never worked more than 9 hours per day. (Tr. 69, Ln. 14-15.)

Arturo was paid a reduced minimum wage of $6.00 per hour plus tips. (Tr. 66, Ln. 10-11; Ex. C.) On weeks where he worked the full 54 hours, he received $324. (Ex. C.) On weeks he did not work 54 hours, he was paid per the hours he worked, for example:

Week of 6/24/13 – 45 hours – paid $270
Week of 8/26/13 – 36 hours – paid $216
Week of 10/07/13 – 45 hours – paid $270

(Tr. 71, Ln. 15-18; Tr. 72, Ln. 1-12; <u>Ex. C.</u> at pp. D088, D097, D103.)  Arturo never worked

more than 54 hours per week throughout the course of his employment, and he also never

worked more than 9 hours per day.  (<u>Ex. C.</u>)  If Arturo came in a little late unintentionally, for

up to a period of one hour, Ibrahim did not dock his pay, although this did not happen often.

(Tr. 89, Ln. 14-25; Tr. 90, Ln. 1-10.)

Arturo stated that he made $30-$40 in tips per day.  (Tr. 45, Ln.3-4.)  Ibrahim testified,

however, that Arturo had not only told him that he was making $70-$80 in tips per day, but he

had confirmed this fact from the online delivery receipts.  (Tr. 68, Ln. 12-13; Tr. 69, Ln. 7-10.)

He received his credit card cash-out daily by Ibrahim or the cashier, which was in addition to

the cash tips he received directly from customers.  (Tr. 67, Ln. 14-15.)  Arturo's non-delivery

duties only included cleaning the floor outside the store and stocking soda, which took him 30-

40 minutes per shift.  (Tr. 74, Ln. 5-15.)

Arturo also partook in the employee meals twice per day, for lunch and dinner.  (<u>Ex. D</u>.)

Ruben and Arturo concede that they ate free lunch and dinner at the store when they worked,

although Ruben claimed that he had to pay $1 for sodas.  (Tr. 17, Ln. 19-25; Tr. 18, Ln. 1-9; Tr.

43, Ln. 20-25.; Tr. 44, Ln. 1-7.)  Arturo contradicted Ruben's testimony, however, stating that

he was told both the sandwiches and sodas were free.  (Tr. 44, Ln. 6-7.)

106 Columbia did not pay Arturo the required overtime rate per hour.  (Tr. 73, Ln. 15-

18.)  This failure was not willful, but was due to the Defendants' misunderstanding of the

application of the tip credit.  Defendants were advised by their accounting firm that because

Arturo was a tipped employee, he could be paid $6.00 per hour as long as he made sufficient

tips to cover his minimum wage.  However, Defendants erroneously believed in good faith that the $6.00 reduced rate applied for overtime hours as well, as long as there were sufficient tips to cover the spread.  (Tr. 66, Ln. 12-22; Tr. 73, Ln. 6-25; Tr. 74, Ln. 1-4; Tr. 88, Ln. 16-24.) Defendants were also not properly advised regarding their recordkeeping requirements regarding written notice of pay rate and weekly stubs.  (Tr. 67, Ln. 3-5.)

## ARGUMENT

**I.**     **This Court lacks original jurisdiction regarding Plaintiffs' federal claims, where there is neither enterprise coverage nor individual coverage under the FLSA**.

The FLSA minimum wage and overtime provisions applies to an enterprise engaged in commerce that: (1) "has employees handling, selling, or otherwise working on goods or materials that have moved in or produced for commerce" and (2) "whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated)."  29 USCS § 203(s)(1).  Whether or not there is FLSA coverage is "an element that a plaintiff must establish in order to prove liability."  Monterossa v. Martinez Rest. Corp., No. 11-CV-3689 (JMF), 2012 U.S. Dist. LEXIS 127811, 2012 WL 3890212, at *7-8 (S.D.N.Y. Sept. 7, 2012)(quoting Benitez v. F & V Car Wash, Inc., 11-CV-1857 (DLI) (SMG), 2012 U.S. Dist. LEXIS 57520, 2012 WL 1414879, at *1.  See also Li v. Zhao, 35 F. Supp. 3d 300, 305 (E.D.N.Y. 2014) ("Employee coverage is an element of the plaintiff's FLSA claim.").  Furthermore, in order to carry its burden, the Plaintiff cannot rely on mere unsupported guesses regarding the Defendants' gross revenues.  See e.g. Xi Dong Gao v. Golden Garden Chinese Rest. Inc., No. CV 13-4761 (LDW) (GRB), 2014 U.S. Dist. LEXIS 183887, at *6, 18-19 (E.D.N.Y. Dec. 16, 2014)(finding restaurant employees could not defeat

summary judgment with estimates of daily gross revenues based on "knowledge" derived from their experience at previous restaurants.)

The FLSA provisions will also apply if there is individual coverage under 29 USCS §§ 206(a), 207(a)(1), where such an employee must be "engaged in commerce or in the production of goods for commerce."  "Employees are 'engaged in commerce' within the meaning of [the FLSA] when they are performing work involving or related to the movement of persons or things . . . among the several States or between any State and any place outside thereof." 29 C.F.R. § 779.103.  Furthermore, there is coverage only "if the employee, as a *regular and recurrent* part of his duties, uses such instrumentalities in obtaining or communicating information or in sending or receiving written reports or messages, or orders for goods or services, or plans or other documents across State lines. 29 C.F.R. § 776.10.  Therefore, "a substantial part of the employee's work must be related to interstate commerce." Bowrin v. Catholic Guardian Soc'y, 417 F. Supp. 2d 449, 466 (S.D.N.Y. 2006)(quoting Boekemeier v. Fourth Universalist Soc'y in the City of New York, 86 F. Supp. 2d 280, 287 (S.D.N.Y. 2000) (internal quotation marks and citations omitted).  See also Owusu v. Corona Tire Shop, Inc., No. 09-CV-3744 (NGG) (JO), 2013 U.S. Dist. LEXIS 55381, 2013 WL 1680861, at *4 (E.D.N.Y. Apr. 17, 2013)("Evidence that an employee sometimes engaged in an activity that can be considered interstate commerce . . . is not sufficient to show that the employee was in the channels of commerce rather than merely affecting commerce.").

   i.   *Ruben's incredulous claims regarding 106 Columbia's daily gross receipts.*

In the instant case, the issue of jurisdiction could not have been properly resolved on summary judgment because there was a material issue of fact with respect to the Defendants'

gross income.  Plaintiff Ruben testified, albeit incredibly, that he could observe that 106 Columbia was making $4,000 a day.  (Tr. 9, Ln. 3-11.)  Therefore, notwithstanding the incredulousness of Plaintiffs' claims, this was an issue of material fact that needed to be resolved by this Court at trial.

Ruben testified that although he was working nonstop during his busy shifts as the solo deli man on duty, he was able to observe and count all the money that was going into the cash register on a daily basis.  (Tr. 19, Ln., 24-25; Tr. 20, Ln. 1-19.)  Ruben gave contradictory testimony as to how he arrived at the $4,000 figure.  First he stated that he knew 106 Columbia was making $4,000 a day "[b]ecause I count the sandwiches, how many I prepared during the day."  (Tr. 21, Ln. 1-2.)  Then when it was revealed that he prepared only 45 sandwiches daily, at an average of $6 per sandwich, which was did not account for his daily estimation of sales, Ruben changed his testimony.  He then stated, that it was [b]ecause what I see was the sales of sandwiches, sodas, beer, deliveries."  (Tr. 21, Ln. 19-20.)  And then when it was revealed that he himself never did any deliveries, he changed his testimony yet again, testifying "because I was working all the time next to the cashier and I see how they make their money.  (Tr. 22, Ln. 1-2.)

He then proceeded to give inconsistent and incredulous testimony about when exactly he witnessed the money being counted by the cash register.  First, he testified that conveniently, it was counted at 4 pm on the days his shift ended at 4 pm, and then at 7 pm on the 2 days he claims his shift happened to end at 7 pm.  (Tr. 23, Ln. 2-5; Ln. 15-16.)  He then testified that he only saw the money being counted when he worked until 7 pm.  (Tr. 23, Ln. 6-11.)  He then conceded that he only saw the money being counted "two or three times when [he] was working from 7 to 4," acknowledging that it was only even possible for him to view the money

being counted twice per week.  (Tr. 23, Ln. 20-24.)  Ruben conceded that he had no other basis

for determining that daily sales were $4,000 per day.  (Tr. 25, Ln. 18-20.)  He did not keep a

written record or tally of the money going into the cash register and he never worked as a

cashier.  Moreover, he could not reasonably have been able to count each and every transaction

daily, or even observe the exact accounting of the money being counted by the register from

even several feet away on a regular basis.  Ruben's claims are simply not credible, lack any

evidentiary support, and are clearly motivated by an incentive to maintain jurisdiction in federal

court.

   ii.   *106 Columbia was not an enterprise engaged in commerce pursuant to the FLSA.*

   Pursuant to 29 C.F.R. § 779.266 (b), tax records are permitted to be used when

computing the annual gross revenue of an employer, wherefore, tax returns are sufficient to

establish a Defendant's gross revenue.  See Yupa v. Country Stone & Fence Corp., Civil

Action No. 14-7384, 2017 U.S. Dist. LEXIS 361, at *11-12 (E.D.N.Y. Jan. 3, 2017)(finding

that tax returns are sufficient to establish annual gross revenue.); Grant v. All Star Baby Safety,

Inc., 2016 U.S. Dist. LEXIS 88851, 2016 WL 3746565 (E.D.N.Y. July 8, 2016)(stating tax

returns can be considered in determining whether the FLSA's $500,000 threshold has been

met.)

   Mere speculation, however, on the part of the Plaintiffs with respect to the credibility of

the tax returns are insufficient.  See e.g. Jian Long Li v. Li Qin Zhao, 35 F. Supp. 3d 300, 306

(E.D.N.Y. 2014) ("It is not enough for [plaintiff] to argue that the tax returns did not credibly

report the restaurant's gross sales, when considered alongside its costs, without furnishing

concrete and affirmative evidence to support the conclusion that the restaurant's gross sales

were more than $500,000 every year.") (internal quotation marks omitted); Xi Dong Gao v.

Golden Garden Chinese Rest. Inc., No. CV 13-4761 (LDW) (GRB), 2014 U.S. Dist. LEXIS

183887, at *19 (E.D.N.Y. Dec. 16, 2014) ("Nothing about plaintiff's mere guesses at Golden

Garden's gross revenue comes close to the concrete and affirmative evidence needed to show a

genuine issue of material fact."); Yang Li v. Ya Yi Cheng, 2012 U.S. Dist. LEXIS 40151, 2012

WL 1004852, at *5-6 (E.D.N.Y. Mar. 23, 2012) (granting the defendants' summary judgment

motion, because "Plaintiffs' opposition to [this motion] attacks the accuracy of [the restaurant's

tax returns] . . . but they have offered no evidence to support this assertion")

In the instant case, 106 Columbia is not an enterprise engaged in commerce. 29 USCS

§ 203(s)(1). This entity was incorporated on December 17, 2010 and began business operations

in December 2010. In the corporate calendar years from December 1st through November 30th

in the years beginning 2010, 2011, 2012, and 2013, Defendants grossed less than $500,000 per

year:

> December 1, 2010 – November 30, 2011: $214,000
> December 1, 2011 – November 30, 2012: $289,372
> December 1, 2012 – November 30, 2013: $320,375
> December 1, 2013 – November 30, 2014: $374,461

(Ex. A, Federal Income Tax Returns 2010-14 at pp. D001, D008, D024, D036, Line 1a)

Moreover, Plaintiffs have not alleged in the Complaint that there was individual

coverage or that they were "engaged in commerce or in the production of goods for commerce"

pursuant to 29 USCS §§ 206(a), 207(a)(1). (Complaint, ¶53.) See also Bowrin v. Catholic

Guardian Soc'y, 417 F. Supp. 2d 449, 466 (S.D.N.Y. 2006). And even if Plaintiffs were to

allege so, the handling of deli items in a local bodega are inadequate to establish individual

coverage. 29 C.F.R. §§ 779.103, 776.10.

Therefore, Plaintiffs have no FLSA coverage with respect to Defendants, wherefore

Plaintiffs' federal claims should be dismissed.

**II.** **This Court should decline to exercise supplemental jurisdiction over the state law claims because the Plaintiffs have raised an incredulous issue of material fact regarding daily revenues in order to force a trial on the matter, and any resulting inconvenience in retrying the matter in state court is of the Plaintiffs' own doing.**

Pursuant to 29 U.S.C. §1367(a), this Court has the discretion to exercise supplemental jurisdiction over Plaintiff's remaining NYLL claims. Subsection (c) of § 1367 provides:

> (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if —
>
> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

Pendant jurisdiction is a "doctrine of discretion, not of plaintiff's right.'" Salim Shahriar v. Smith & Wollensky Rest. Grp., Inc., 659 F.3d 234, 245 (2d Cir. 2011)(internal quotations omitted.)  The Supreme Court has held that:

> [R]ecognition of a federal court's wide latitude to decide ancillary questions of state law does not imply that it must tolerate a litigant's effort to impose upon it what is in effect only a state law case. Once it appears that a state claim constitutes the real body of a case, to which the federal claim is only an appendage, the state claim may fairly be dismissed.

United Mine Workers v. Gibbs, 383 U.S. 715, 727, 86 S. Ct. 1130, 1139-40 (1966) "Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional 'values of judicial economy, convenience, fairness, and comity . . . in deciding whether to exercise jurisdiction." Kolari v. N.Y.-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006)(quoting Carnegie Mellon-Univ. v. Cohill, 484 U.S. 343, 350, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988)).

In balancing such factors, the issue of "fairness involves questions of equity: Will declining jurisdiction prejudice the parties, and are the parties responsible for any such prejudice?" Chenensky v. N.Y. Life Ins. Co., 942 F. Supp. 2d 388, 392 (S.D.N.Y. 2013)

Furthermore, "parties are responsible for any prejudice that they may encounter" when they bring state-law claims into federal court, and where they know that jurisdiction was "pendent and possibly tentative." Chenensky v. N.Y. Life Ins. Co., supra, at 394.  As the judge found in the Chenensky case, in declining to exercises supplemental jurisdiction, FLSA/NYLL Plaintiff's desire to keep cases in federal court:

> …is less about whether jurisdiction is proper and more about exploiting a difference in state and federal procedure, which allows for double damages in federal court…..But Chenensky's potential recovery is not a factor that favors retaining supplemental jurisdiction. To the contrary, by attempting to shoehorn a state case into federal court, Chenensky assumed the risk that his state claims would be dismissed.

Id. at 394-395.

It is well-established that where all federal claims of original jurisdiction have been dismissed, the factors generally weigh in favor of a court dismissing the pendant state law claims, where they can be refiled in state court.  See Krupinski v. Laborers E. Region Org. Fund, No. 15-cv-982 (RJS), 2016 U.S. Dist. LEXIS 136858, at *34-36 (S.D.N.Y. Sep. 30, 2016)(dismissing state law labor claims at summary judgment.); Jian Long Li v. Li Qin Zhao, supra, at 310; Yang Li v. Ya Yi Cheng, supra, at 6; Bhd. of Locomotive Eng'rs Div. 269 v. Long Island R.R., 85 F.3d 35, 39 (2d Cir. 1996); Volpe v. Am. Language Commu'n Ctr., Inc., No. 15-cv-06854 (GBD), 2016 U.S. Dist. LEXIS 103850, 2016 WL 4131294, at *6 (S.D.N.Y. July 29, 2016); Amparo v. Ink Point Tattoo, No. 13-cv-07232 (LGS), 2015 U.S. Dist. LEXIS 5510, 2015 WL 224360, at *4 (S.D.N.Y. Jan. 15, 2015).

Furthermore, "[c]ourts must determine whether to continue to exercise supplemental jurisdiction 'at every stage of the litigation,'" including even after the trial stage, where in some circumstances, other interests outweigh the interest of judicial economy.  Chenensky v. N.Y. Life Ins. Co., supra, at 391. (internal citations omitted).  See, e.g., Williams Elecs. Games v. Garrity, 479 F.3d 904, 906-07 (7th Cir. 2007) (affirming that the lower court exercised reasonable discretion in its decision not to exercise supplemental jurisdiction over state claims after a trial, even though it weighed against the interest of judicial economy.)  Moreover, since New York CPLR §205 allows a plaintiff to recommence a dismissed suit within six months, notwithstanding the applicability of any statute of limitations, plaintiffs are not prejudiced by the dismissal of NYLL claims.

In the instant case, the Plaintiffs are responsible for any inconvenience they may incur as a result of having refile and retry this matter in state court.  They have fabricated an incredulous issue of material fact with respect to Ruben's daily observations of Defendants' gross sales in order to preclude dismissal of their federal claims and to "shoehorn a state case into federal court."  The incredulousness of the Plaintiffs' claims at having "observed" $4,000 of daily sales became glaringly apparent under cross-examination, where it was clear from the shifting testimony that the statements were an intentional fabrication.

In the instant case, this Court may dismiss all federal claims pursuant to section (I) of this brief, which satisfies (c)(3) of §1367.  The statute also allows the court to decline supplemental jurisdiction pursuant to (c)(4), where there are other compelling reasons.  The Cohill balancing test outlined above asks the court to weigh issues of fairness and equity in determining whether to exercise discretion.  In the instant case, the Plaintiffs should not inure

the benefit of their wrongdoing.  But for the fabricated material issue, this is a state case.  The Plaintiff's false testimony regarding this issue goes to the heart of a fairness/equity evaluation by this Court.  The Plaintiffs assumed any risk of retrying this case in state court when they file a case based on supplemental jurisdiction.  Furthermore, they will not be prejudiced unduly by a dismissal, where pursuant to the CPLR they have six months to refile in state court irrespective of the NYLL statute of limitations.  Wherefore, we respectfully request that this Court decline to grant supplemental jurisdiction over the NYLL claims.

### III. The Plaintiffs' testimonies regarding the dates of employment, hours, and pay were contradictory and lacked credibility.

The Plaintiffs gave contradictory, inconsistent, and implausible testimony regarding material facts.  Moreover, there were matters about which the Plaintiffs claimed "100%" certainty, but in fact, were demonstrably false.

The Plaintiffs gave contradictory testimony as to when they stopped working at 106 Columbia.  Ruben testified that he and Arturo stopped working at the same time in August 2014.  (Tr. 10, Ln. 2-5.)  Arturo, however, claimed that he worked until September 2015.  (Tr. 27, Ln. 7-10.)  Arturo continued to proclaim his certainty that he left in *2015*, not 2014, under cross-examination.  (Tr. 36, Ln. 19-20; Tr. 11-16.)  He also claimed that Ruben left with him in August 2015.  (Tr. 36, Ln. 21-23; Tr. 29, Ln. 18-25.)  Aside from Ruben's confirmation that the Plaintiffs' left in 2014, and the Defendants' records confirming that the Plaintiffs left in 2014, Arturo's account that the Plaintiffs quit 106 Columbia on or about the same time cannot be true if Arturo and Ruben quit in 2015.  Ruben operated his flower business for about one year after he left 106 Columbia, before he was evicted and fired from Mario's Deli and he raised the

instant suit.  (Tr. 11, Ln. 24-25; Tr. 18, Ln. 18-19; Tr. 19, Ln. 10; Tr. 37, Ln. 7-8, 17-19; Tr. 38, Ln. 2-5; Tr. 39, Ln. 12-13.)  Furthermore, Defendants sold their business in June 2015, so Plaintiffs could not have been employed in August 2015.  (Tr. 49, Ln. 4-17.)  Arturo also gave conflicting statements under oath as to how many days after Ruben quit he left 106 Columbia, stating at one point that it was one month and later that it was only four days.  (Tr. 36, Ln. 22-25; Tr. 37, Ln. 1-5.)

Ruben gave contradictory testimony about his conversations with Ibrahim about his pay.  First, he testified that he never complained or spoke to Ibrahim about his pay, hours, or about issues with overtime.  (Tr. 10, Ln. 23-24; Tr. 13, Ln. 7-9.)  Then, he later contradicted his testimony, stating that if he ever asked about overtime, Ibrahim would threaten him. (Tr. 13, Ln. 23-25.)  Ruben also gave dubious testimony, about a purported threat Ibrahim made in 2010.  When questioned specifically about the timing, he reiterated his 100% certainty that the threat was made in 2010 because that was "when they paid me $10 an hour."  (Tr. 13, Ln. 13-22; Tr. 14, Ln. 10-16.)  This testimony is incredulous for several reasons.  Firstly, Ibrahim did not even buy 106 Columbia until December 2010, wherefore a threat regarding pay upon hiring sounds unlikely to lead to any potential employee accepting the job.  (Tr. 49, Ln. 21-24.)  Moreover, 106 Columbia's Pay/Time Log confirms that upon hiring in January 2011, Ruben was not paid $10 per hour, rather he was paid $8.50 an hour regular rate, and an overtime rate of $12.75 through January 2012.  (Ex. B.)  So again, Ruben's recollection regarding material facts in this case is inaccurate

Moreover, Ruben's testimony that Ibrahim threatened him by saying "there are many Mexicans looking for work" is suspect given that Ruben admits that he made those same exact allegations against Muhammed at his deposition, and now, he was making them against

Ibrahim.  (Tr. 14, Ln. 3-12.)  Ibrahim testified that he never threatened Ruben, who he believed

was a good employee and was forced to turn to when he was short experienced deli workers.

(Tr. 64, Ln. 7-15; Tr. 103, Ln. 2-8.)

Ruben's testimony regarding the dates of when he first met Ibrahim and when he began

working for 106 Columbia is also off by several years.  He claims that he first met Ibrahim in

2007.  (Tr. 14, Ln. 17-25; Tr. 15, Ln. 1-6.)  Ruben also alleges that he began working at 106

Columbia in 2007, and that he worked through August 2014.  (Tr. 6, Ln. 11-19.), This,

however, is impossible because 106 Columbia did not begin business until December 17, 2010.

The Plaintiffs concede this much in their request for damages, only computing Ruben's

damages as of the date Ibrahim purchased the store, December 17, 2010.  (Plaintiff's Proposed

Conclusions of Fact and Law Ex. A, Dkt #92-1.)

Arturo gave contradictory testimony the hours he spent performing non-delivery tasks.

He testified on direct that he would spend "five to six hours" in between deliveries performing

these tasks.  (Tr. 31, Ln. 13-17.)  Both on direct and on cross, he testified that "all I did" was

stock soda, take away garbage, and stock ice, and that he performed no other non-delivery

activities except those tasks.  (Tr. 40, Ln. 8-14; Tr. 31, Ln. 6-12.)  He later contradicted

himself, stating that he only spent 2.5 hours performing non-delivery duties.  (Tr. 42, Ln. 14-

16; Tr. 43, Ln. 1-19.)

Therefore, such contradictions and inconsistencies in the Plaintiffs' testimonies raise

glaring issues regarding the veracity of their claims.  They have sued a handful of employers in

the same neighborhood, whom they claim to have worked for between 2009 and 2015, and it is

apparent that they either are unable to recollect the specific facts regarding dates/hours/pay at

106 Columbia specifically, or they are intentionally manipulating their testimonies to apply to the only Defendants who have appeared and are being tried.

**IV.** **All employees maintained a fixed schedule, wherefore the Defendants complied with their hourly record-keeping obligations pursuant to 29 CFR §516.2(c).**

For employees without fixed schedules, employers are required to maintain a record of employees' "hours worked each workday and total hours worked each workweek."  29 CFR § 516.2(a)(7).  However, for employees working on *fixed schedules*: "[A]n employer may maintain records showing instead…the schedule of daily and weekly hours the employee normally works. Also, (1) In weeks in which an employee adheres to this schedule, indicates by check mark, statement or other method that such hours were in fact actually worked by him, and (2) In weeks in which more or less than the scheduled hours are worked, shows that exact number of hours worked each day and each week."  29 CFR § 516.2(c).

In the instant case, Defendants' Pay/Time Log complied with their time-keeping obligations pursuant to the NYLL.  106 Columbia's employee schedules were fixed and did not vary unless an employee took a day off.  (Tr. 84, Ln. 20-21.)  Ruben worked 9-hour shifts from 7:00 AM to 4:00 PM, six days per week, with a 30-minute break.  (Ex. B.)  Likewise, Arturo worked 9-hour shifts from 7:00 PM to 4:00 AM, six days per week, with a 30-minute break. (Ex. C.)  Neither Plaintiff ever worked more than their regular schedule of 54 hours per week. When the Plaintiffs worked less than their regular schedule, the Pay/Time Log properly recorded the reduction in hours.  (Ex. B at pp. D069, D074, D078; Ex. C at pp. D088, D097, D103.)

**V.**     **Ruben has failed to demonstrate that he worked any hours for which he was not properly compensated.  He was paid a lawful minimum wage for all regular hours worked, and a lawful overtime rate for all hours worked over 40**.

"An employee who brings suit under § 16 (b) of the Act for unpaid minimum wages or unpaid overtime compensation, together with liquidated damages, has the burden of proving that he performed work for which he was not properly compensated."  Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 686-87, 66 S.Ct. 1187, 1192 (1946).  Even if it is established that the employer's records are insufficient or incomplete, an employee must produce "sufficient evidence to show the amount and extent of that work as a matter of *just and reasonable inference*…" and must demonstrate that the employer had actual or constructive knowledge of such uncompensated work.  Id. at 687 (emphasis added).   The employer may negate the reasonableness of the inference to be drawn from the employee's testimony through its evidence.  Id. at 687-88.

Ruben was properly compensated for all hours worked.  106 Columbia's time records in the Pay/Time Log confirm periods of time Ruben was employed by 106 Columbia, as well as the daily/weekly hours worked.  (Ex. B, Salustio Pay/Time Log.)  It also confirms that he was paid a regular rate of $8.50 per hour and an overtime rate of $12.75 through January 9, 2012, after which he was paid $10 per hour and $15 per hour overtime.  (Id.)  Plaintiff Ruben has failed to provide any sufficient evidence that he performed any uncompensated work.

Wherefore, judgment should be granted in favor of Defendants against Plaintiff Ruben Salustio.

23

**<u>VI.    Arturo was paid a reduced minimum wage based on the good faith belief that he was properly classified as a tipped employee</u>.**

Under the FLSA, a "[t]ipped employee means any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." <u>29 USCS § 203(t)</u>.  For such an employee, the employer is entitled to take a tip credit toward its minimum wage obligation.   <u>29 USCS § 203(m)</u>.  Such a tip credit is permitted under FLSA as long as two conditions are satisfied: (1) they must have informed the employee of the provisions of § 203(m); and (2) all of the tips received by such employee must have been retained by the employee.  <u>Id.</u>  <u>See</u> <u>Copantitla v. Fiskardo Estiatorio, Inc.</u>, 788 F. Supp. 2d 253 (S.D.N.Y. 2011).

The FLSA's notice provision does not require written notice.  <u>See</u> <u>29 U.S.C. § 203(m)</u>; <u>Copantitla</u>, <u>supra</u>, 788 F. Supp. 2d at 288 (the court evaluated the substance of oral statements made to employees.)  With respect to the tip-credit notice under FLSA, "[e]mployers do not have to 'explain' the tip credit to employees…it is enough to inform them of it."  <u>Heng Chan v. Triple 8 Palace, Inc.</u>, 2006 U.S. Dist. LEXIS 15780, *67, 2006 WL 851749 (S.D.N.Y. Mar. 30, 2006)(citing <u>Kilgore v. Outback Steakhouse of Florida, Inc.</u>, 160 F.3d 294, 298-300 (6th Cir. 1998)).

The NYLL contains similar provisions regarding the permitted tip credit notice pursuant to <u>12 NYCRR § 146-1.3</u>, but it is subject to the following more stringent written requirements:

> (a)  Prior to the start of employment, an employer shall give each employee written notice of the employee's regular hourly pay rate, overtime hourly pay rate, the amount of tip credit, if any, to be taken from the basic minimum hourly rate, and the regular payday. The notice shall also state that extra pay is required if tips are insufficient to bring the employee up to the basic minimum hourly rate. The employer must provide notice in (1) English and (2) any other language spoken by the new employee as his/her primary language, so long as the Commissioner

has made such notice available to employers in such language on the Department's website.  12 NYCRR § 146-2.2.

Under the FLSA, the computation of the tip-credit is equal to the difference between the required cash wage (which must be at least $2.13) and the federal minimum wage of $7.25. Therefore, the maximum tip credit that the Defendants can claim under the FLSA is $5.12 per hour.  29 USCS § 203(m).

Pursuant to the NYLL, however, the computation of the tip credit for service employees for the relevant periods are computed as follows:

> On and after January 1, 2011, a service employee shall receive a wage of at least $ 5.65 per hour, and credit for tips shall not exceed $ 1.60 per hour, provided that the total of tips received plus wages equals or exceeds $ 7.25 per hour.  12 NYCRR § 146-1.3(a)(1).

> On and after December 31, 2013, a service employee shall receive a wage of at least $ 5.65 per hour, and credit for tips shall not exceed $ 2.35 per hour, provided that the total of tips received plus wages equals or exceeds $ 8.00 per hour.  12 NYCRR § 146-1.3(a)(2).

Even if this Court finds that Defendants did not provide the requisite notice of tip-credit required, such an error was not willful, where 106 Columbia acted with the good faith belief that they were in compliance with the regulations.

### VII.   Plaintiffs have failed to demonstrate that they worked a spread of hours ten hours or longer on any day worked.

Under the NYLL, "[a]n employee shall receive one hour's pay at the basic minimum hourly wage rate, in addition to the minimum wage required in this Part for any day in which: (a) the spread of hours exceeds 10 hours…" 12 NYCRR § 142-2.4(a).

In the instant case, neither Plaintiff worked more than 9 hours per day, and so the spread of hours never exceeded 10 hours during any shift.  Wherefore judgment should be granted in favor of Defendants against both Plaintiffs.


**VIII.** **Defendants are entitled to a credit for meals provided to Plaintiffs, and the bona-fide 30-minute breaks during the Plaintiffs' shifts should not be compensated.**

"Under the FLSA and NYLL, bona fide meal periods are not considered work time."

Nakahata v. New York-Presbyterian Healthcare Sys., 2012 U.S. Dist. LEXIS 127824, *22, 2012 WL 3886555 (S.D.N.Y. Sept. 6, 2012).  Pursuant to FLSA, meal breaks that last 30 minutes or longer should be calculated as off-the-clock time:

> Bona fide meal periods are not worktime. Bona fide meal periods do not include coffee breaks or time for snacks. These are rest periods. The employee must be completely relieved from duty for the purposes of eating regular meals. Ordinarily 30 minutes or more is long enough for a bona fide meal period…. 29 CFR § 785.19.

Furthermore, "[i]t is not necessary that an employee be permitted to leave the premises if he is otherwise completely freed from duties during the meal period." 29 C.F.R. § 785.19(b).

Furthermore, under both the FLSA and the NYLL, an employer can take an allowance against employees' wages in exchange for meals it provides to the employee.  29 USCS § 203(m); 12 NYCRR § 146-1.9.  The FLSA allows an employer to take a reasonable credit for meals provided to employees.  29 USCS § 203(m).  As the Second Circuit has held, such meals are "presumed to be part of wages under the statute."  Archie v. Grand Cent. P'shp, 86 F. Supp. 2d 262, 268 (S.D.N.Y. 2000)(citing Soler v. G. & U., Inc., 833 F. 2d. 1104, 1108 (2d Cir. 1987)).

Pursuant to the NYLL, the meal credit allowance can be "no more than $2.50 per meal." 12 NYCRR § 146-1.9.  To qualify as a meal, however, the employer "shall provide adequate portions of a variety of wholesome, nutritious foods and shall include at least one of the types of food from all four of the following groups: (1) fruits or vegetables; (2) grains or potatoes; (3) eggs, meat, fish, poultry, dairy, or legumes; and (4) tea, coffee, milk or juice." 12 NYCRR § 146-3.7.  Furthermore, the language of the meal credit regulation does not expressly require notice, by pay stub or otherwise, as a condition of taking the credit.  Compare 12 N.Y.C.R.R. § 146-1.9 (meal credit "may be considered part of the wages"), with 12 N.Y.C.R.R. § 146-1.3 (tip credit may be taken "if the employee has been notified of the tip credit….")

In the instant case, the 30-minute daily break taken by both Plaintiffs should be deducted from any hourly recomputation of the Plaintiffs' wages.  Furthermore, the Plaintiffs both concede they ate free meals for lunch and dinner, wherefore Defendants are entitled to a meal credit for the free lunch and dinner meals provided to Plaintiffs in the amount of $5.00 per day.  Defendants offered employees a wide variety of foods, to which they availed themselves daily.  (Ex. D.)


## IX.    Plaintiffs failed to demonstrate that Defendants acted with any willfulness to violate the FLSA, wherefore a two-year statute of limitation is applicable.

The statute of limitations to bring a FLSA action is two years after the cause of action accrued, unless the violation was willful, where the statute is extended to three years.  29 USCS § 255(a).  The Plaintiffs have failed to demonstrate that the Defendants acted with any willful disregard for their obligations under the FLSA or the NYLL, warranting a three-year FLSA limitations period or liquidated damages.  Plaintiffs only proffer insufficient conclusory assertions in their pleadings to support their claims.  See Preacely v. AAA Typing & Resume,

Inc., 2015 U.S. Dist. LEXIS 33684, *5-6 (S.D.N.Y. Mar. 18, 2015)(citing Llolla v. Karen

Gardens Apartment Corp., 12-CV-1356, 2014 WL 1310311 *4 (E.D.N.Y. Mar. 10,

2014)(explaining conclusory allegations "do not suffice, without more, to establish defendants'

willfulness.")  An employer's conduct is not willful if the employer acts reasonably in

determining its legal obligations. Nor is the conduct willful even if the employer acts

unreasonably, so long as it is not reckless.  As the Supreme Court explains,

> If an employer acts reasonably in determining its legal obligation, its
> action cannot be deemed willful under either petitioner's test or under the
> standard we set forth. If an employer acts unreasonably, but not recklessly,
> in determining its legal obligation, then, although its action would be
> considered willful under petitioner's test, it should not be so considered
> under Thurston or the identical standard we approve today.  McLaughlin
> v. Richland Shoe Co., 486 U.S. 128, 135 n.13, 108 S.Ct. 1677, 1682
> (1988).

"The fact that Congress did not simply extend the limitations period to three years, but instead

adopted a two-tiered statute of limitations, makes it obvious that Congress intended to draw a

significant distinction between ordinary violations and willful violations." Gunawan v. Sake

Sushi Rest., 897 F. Supp. 2d 76, 86-87 (E.D.N.Y. 2012) (quoting McLaughlin, supra, at 132).

 Plaintiffs have failed to establish that Defendants knew their conduct was prohibited by

the FLSA or that they intentionally disregarded their obligations at the time they may have

violated the FLSA.  It is clear in the instant case that, other than the potential violations

themselves, there is nothing to support a finding of willfulness.

 Plaintiffs, however, may not receive a "double recovery" of back wages under both the

FLSA and NYLL.  Gen. Tel. Co. of the Nw. v. EEOC, 446 U.S. 318, 333 (1980); Pl. Br. 19 n.8.

Ultimately, however, even if this Court found in favor of the Defendants in the application of a

two-year statute of limitations, any computation under the NYLL will functionally be the

prevailing award of damages, both because there is higher minimum wage under state law for some periods, and because there is a longer 6-year statute of limitations applicable.

**X.      Defendants acted with a good faith belief that they were in compliance with the FLSA and the NYLL, wherefore this Court should not impose liquidated damages.**

"Under the FLSA, a plaintiff who demonstrates that he was improperly denied either minimum wage or overtime wages may recover, in addition to reimbursement of these unpaid wages, an equal amount as liquidated damages." Yuquilema v. Manhattan's Hero Corp., No. 13-cv-461 (WHP) (JLC), 2014 U.S. Dist. LEXIS 120422, 2014 WL 4207106, at *7 (S.D.N.Y. Aug. 20, 2014) (citing 29 U.S.C. § 216(b)), report and recommendation adopted, No. 13-cv-461, 2014 U.S. Dist. LEXIS 139061, 2014 WL 5039428 (S.D.N.Y. Sept. 30, 2014).  "Courts may exercise discretion to deny liquidated damages where the employer shows that even in violating statutory and regulatory wage, hour, and recordkeeping requirements, it acted in subjective 'good faith and had objectively 'reasonable grounds' for believing that the unlawful acts did not violate the FLSA.  Hernandez v. JRPAC Inc., supra, 2016 U.S. Dist. LEXIS 75430, at *107-08 (quoting 29 U.S.C. § 260.)  See also Hart v. Rick's Cabaret Int'l, Inc., 967 F. Supp. 2d 901, 938 (S.D.N.Y. 2013)(internal citations omitted)(internal quotation marks omitted)("To establish the requisite subjective 'good faith,' an employer must show that it took active steps to ascertain the dictates of the FLSA and then act to comply with them.").  The NYLL parallels similar language which bestows the court with discretion to deny liquidated damages where the "employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law." NYLL §§ 198(1-a) (effective April 9, 2011).

Furthermore, the majority view in this Circuit has moved towards denying liquidated damage recovery under both the FLSA and the NYLL.  See e.g. Almanzar v. 1342 St. Nicholas Ave. Rest. Corp., No. 14CV7850 (VEC) (DF), 2016 U.S. Dist. LEXIS 155116, at *26-28 (S.D.N.Y. Nov. 7, 2016); Hernandez v. JRPAC Inc., 2016 U.S. Dist. LEXIS 75430, at *111-12 (S.D.N.Y. June 9, 2016); Sun v. China 1221, Inc., No. 12-cv-7135 (RJS), 2016 U.S. Dist. LEXIS 52292, at *8-10 (S.D.N.Y. Apr. 19, 2016); Castillo v. RV Transport, Inc., No. 15cv0527 (LGS), 2016 U.S. Dist. LEXIS 48503, 2016 WL1417848, at *2-3 (S.D.N.Y. Apr. 11, 2016); Parilla v. Salt & Pepper on 33rd St. Inc., No. 12 Civ. 6382 (AKH), 2013 U.S. Dist. LEXIS 124992, 2013 WL 4536628, at *2 (S.D.N.Y. Apr. 8, 2013); Rodriguez v. Obam Mgmt., No. 13cv00463 (PGG) (DF), 2016 U.S. Dist. LEXIS 155315, at *56-57 (S.D.N.Y. Nov. 7, 2016); Santana v. Latino Express Rests., Inc., No. 15cv4934 (LTS), 2016 U.S. Dist. LEXIS 98954, 2016 WL 4059250, at *5 (S.D.N.Y. July 28, 2016); Andrade v. 168 First Ave. Rest. Ltd., No. 14cv8268 (JPO) (AJP), 2016 U.S. Dist. LEXIS 72678, 2016 WL 3141567, at *7-8 (S.D.N.Y. June 3, 2016); Gortat v. Capala Bros., 949 F. Supp. 2d 374, 381 (E.D.N.Y. 2013).

In the instant case, Defendants acted in good faith in seeking out advice about their obligations under the labor law and complying with the law.  They did not act with any willfulness or intent to violate the FLSA or the NYLL, and they sought to seek advice regarding their compliance, but were either given incomplete advice or they misunderstood what they were told.  Ruben was paid a lawful minimum wage and overtime for all hours worked over 40.  They maintained the Pay/Time Log, which kept a record of (i) weekly dates worked; (ii) start-time; (iii) break-time; (iv) end-time; (v) total regular hours; (vi) total overtime hours; (vii) regular rate of pay; (viii) overtime rate of pay; (ix) total pay; and (x) date paid.  (Ex. B; and Ex. C.)  Furthermore, where Defendants had questions about their obligations under the

labor law, they took active steps to seek guidance from their accounting firm.  Their

misunderstanding of the application of the tip-credit led them to improperly calculate Artruo's

overtime rate, and they were not properly advised regarding their duty to provide employees

with written pay rate notices, including information about the tip-credit, and the requirement

for weekly wage statements.  Nonetheless, the Defendants' errors were not done out of any

willful intent to underpay employees or to avoid their obligations pursuant to the FLSA or the

NYLL.


        WHEREFORE, Defendants respectfully request that this Court dismiss all FLSA claims

and to decline to exercise supplemental jurisdiction over the NYLL claims, or in the alternative,

to grant judgment in favor of Defendants.


Date: July 12, 2017


                                        BY: THE ANTONIOUS LAW FIRM


                                        s:/Jacqueline S. Kafedjian
                                        Jacqueline S. Kafedjian, Esq.
                                        *Attorney-for-Defendants*
                                        62-26 Myrtle Avenue,
                                        Suite 105
                                        Glendale, NY 11385
                                        Tel: (718) 456-5500
                                        Fax: (718) 335-8369
                                        jackie@antoniouslawfirm.com

TO:     *via ECF*
        Jesse S. Barton, Esq.
        Michael Faillace & Associates, P.C.
        *Attorney-for-Plaintiffs*
        jbarton@faillacelaw.com