UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
RUBEN SALUSTIO et al.,                              :

                                                    :          OPINION AND ORDER

                         Plaintiffs,

                                                    :          15 Civ. 6857 (GWG)

        -v.-

                                                    :

106 COLUMBIA DELI CORP. et al.,

                                                    :

                         Defendants.                :
-----------------------------------------------------------------X
GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE

        Plaintiffs Ruben Salustio and Arturo Vivaldo brought this action to recover unpaid

wages, overtime wages, and other damages under the Fair Labor Standards Act, 29 U.S.C. § 201

et seq. ("FLSA"), and the New York Labor Law, N.Y. Labor Law § 1 et seq. ("NYLL").  The

defendants are 106 Columbia Deli Corporation and Ibrahim Alzubairy.  The Court held a bench

trial on June 12, 2017, see Transcript, filed Aug. 23, 2017 (Docket # 106) ("Tr."),  and has

considered the parties' pre-trial and post-trial submissions.[1]

        This Opinion and Order contains the findings of fact and conclusions of law required by

Federal Rule of Civil Procedure 52(a)(1).

---

        [1]  See Plaintiffs' Proposed Findings of Fact and Conclusions of Law, filed Mar. 23, 2017
(Docket # 92); Plaintiffs' Pretrial Memorandum of Law, filed Mar. 23, 2017 (Docket # 93);
Defendants' Pre-Trial Memorandum of Law, filed Mar. 23, 2017 (Docket # 94); Defendants
Proposed Findings of Fact and Conclusions of Law, filed Mar. 23, 2017 (Docket # 95); Pretrial
Order, filed Apr. 4, 2017 (Docket # 100) ("Pretrial Order"); Defendants' Post-Trial Brief, filed
July 12, 2017 (Docket # 102) ("Defs. Post-trial Mem."); Plaintiffs' Post-Trial Memorandum of
Law, filed July 12, 2017 (Docket # 103) ("Pls. Post-trial Mem."); Plaintiffs' Response to
Defendants' Post-Trial Memorandum of Law, filed July 21, 2017 (Docket # 104) ("Pls. Post-trial
Reply"); Defendants' Post-Trial Reply, filed July 21, 2017 (Docket # 105) ("Defs. Post-trial
Reply").

## I. BACKGROUND

In brief, plaintiffs claim that they worked for defendants' delicatessen and were not properly paid under federal and state labor laws. They claim that they worked more hours than are reflected on defendants' records; that they were not paid for overtime work; that defendants did not provide them with the notices required by the NYLL; and that defendants failed to pay them "spread of hours" pay as required by the NYLL. See Pls. Post-trial Mem. at 11-18. Vivaldo, who was a delivery worker for defendants, additionally claims that defendants improperly used a "tip-credit" to calculate his hourly wage instead of paying him at the minimum wage rate. Id. at 12-17.

As further explained below, the Court has subject matter jurisdiction over plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over their state law claims under 28 U.S.C. § 1367(a).

## II. FACTS

### A. Undisputed Facts

106 Columbia Deli Corp. is a domestic corporation that does business as a delicatessen called "106 Columbia Deli" at 945 Amsterdam Avenue in New York, New York.[2] Pretrial Order at 9. The plaintiffs are former employees of 106 Columbia Deli Corp. and of Ibrahim Alzubairy, who was the president and sole shareholder of the corporation. Id.; Alzubairy: Tr. 48-49. From its date of incorporation to the date plaintiffs filed this lawsuit, Alzubairy (1) hired and fired employees; (2) determined employees' work hours and schedules; (3) paid employees; and (4) managed and supervised employees, including the plaintiffs. Pretrial Order at 9.

---

[2] The parties also refer to the business as simply "Columbia Deli." (See, e.g., Salustio: Tr. 6; Alzubairy: Tr. 80).

Defendants concede that Vivaldo was not paid the proper overtime rate per hour.  See Defendants Proposed Findings of Fact and Conclusions of Law, filed Mar. 23, 2017 (Docket # 95), ¶ 51.  Also, defendants have not disputed that plaintiffs were never given written notice of what their hourly wage would be or on what basis any reductions would be made from that wage — including, in Vivaldo's case, any "tip credit" taken — and were not given any written statements with each week's pay.  (Salustio: Tr. 8; Vivaldo: Tr. 30-31; Alzubairy: Tr. 66-67, 93-94).

B.  Trial Testimony

In the next section, we summarize the relevant testimony of each witness, without making a finding of fact as to the matters testified to.  The findings of fact are contained in section I.D below.

1.  Ruben Salustio

Salustio started working at Columbia Deli as a sandwich preparer in 2007 and stopped working there in August 2014.  (Salustio: Tr. 6).  He worked at the deli continuously and did not take any vacations while he worked there.  (Id.).  He worked 60 hours every week: from 7:00 a.m. to 4:00 p.m. on Mondays, Tuesdays, Fridays, and Saturdays, and from 7:00 a.m. to 7:00 p.m. on Wednesdays and Thursdays.  (Id.).  He did not receive any breaks during the workday.  (Salustio: Tr. 7).  Salustio was never asked to record the time at which he started or ended work, nor shown any time or pay records by Columbia Deli.  (Id.).

Salustio was hired by a man named Muhammad, who was his boss from 2007 to 2010.  (Salustio: Tr. 15).  He first met Alzubairy in 2007, when Alzubairy was working at Columbia Deli as a cashier.  (Salustio: Tr. 14-15).  Alzubairy became Salustio's boss in 2010.  (Salustio: Tr. 16).

From December 2010 until his last day at Columbia Deli, Salustio was paid $10 an hour, in cash. (Salustio: Tr. 7-8). He was never given a document informing him what his pay would be, never discussed overtime pay with anyone, and received the same pay for regular and overtime work. (Salustio: Tr. 8). He ate lunch and dinner in the store, and while he did not have to pay for sandwiches, he had to pay $1 for sodas. (Salustio: Tr. 17).

Salustio worked next to the cash register. (Salustio: Tr. 9). He could see how much money the deli made by watching how much money went in and out from the register. (Id.). He testified the delicatessen made "$4,000 a day." (Id.).

On cross-examination, Salustio testified that even though he was very busy with his work, he could still observe the money going into the cash register and keep track of the number of sandwiches sold. (Salustio: Tr. 19-22). He estimated that about 45 "big" sandwiches were sold each day, for about $6 each, and that "the sales of sandwiches, sodas, beer, [and] deliveries" reached the $4,000 mark. (Salustio: Tr. 21-22). He also testified that he saw Alzubairy and Muhammad count the money in the cash register each evening. (Salustio: Tr. 22). He said that he saw them count the money "two or three times" on the days when he worked from 7:00 a.m. to 4:00 p.m., but watched the money being counted every day he worked from 7:00 a.m. to 7:00 p.m. (Salustio: Tr. 23).

During cross-examination, Salustio's testimony made clear that his statement on direct examination that he worked from 7:00 a.m. to 4:00 p.m. on Saturdays was incorrect. He admitted that between 2010 and 2014 he in fact "used to help [his] brother-in-law [who had a flower shop] two or three days"; that on those two or three days he "went in at 7 a.m. and . . . left at 1 p.m."; and that those days occurred "whenever [his brother] needed [him]," and included Saturdays. (Salustio: Tr. 19).

4

2. <u>Arturo Vivaldo</u>

Vivaldo began working for Columbia Deli as a delivery person in January 2013, and stopped working there in September 2015, about four days after Salustio left. (Vivaldo: Tr. 27, 36-37).[3] He applied for the job, along with Salustio, in December 2012, but Muhammad hired Salustio instead. (Vivaldo: Tr. 33). He then was hired in 2013 by Alzubairy. (Vivaldo: Tr. 33-34). He left in 2015 because he saw Salustio and Muhammad get into an argument at "Mario Deli" at 106th Street and Amsterdam in New York, New York, about 20 meters from Columbia Deli, which was apparently where Salustio was working at a flower shop. (<u>See</u> Vivaldo: Tr. 37-39). He said that Muhammad was a supervisor at both Mario Deli and Columbia Deli, and that he saw this argument while he was retrieving his bicycle from Mario Deli. (Vivaldo: Tr. 38-39).

Vivaldo's shift at Columbia Deli was from 7:00 p.m. to 7:00 a.m., seven days per week from 2013 to February 2014 and six days per week from then until September 2015. (Vivaldo: Tr. 28). He testified that he did not take any breaks while working. (Vivaldo: Tr. 29). Vivaldo was never asked to record what time he arrived or when he left work, and was not aware of any system in place at Columbia Deli by which they kept track of his hours. (Vivaldo: Tr. 28-29).

Initially Vivaldo was paid $250 per week, plus any tips he received, but in February 2014 his weekly pay increased to $300. (Vivaldo: Tr. 29-30). He would receive the same wage even if he "worked hours beyond [his] typical schedule." (Vivaldo: Tr. 30). He was paid in cash, and was never given any sort of document with his pay, nor any document explaining his rate of pay. (<u>Id.</u>). He also made a total of "[a]round 30 to 40 dollars" in tips each day, both from cash and credit card receipts. (Vivaldo: Tr. 45). No one at Columbia Deli explained to Vivaldo the basis

---

[3] Vivaldo first testified that he left "about a month" after Salustio, but changed his testimony during cross-examination. (Vivaldo: Tr. 36-37).

on which Vivaldo was paid, nor how receiving tips affected his weekly pay. (Vivaldo: Tr. 30-31). Vivaldo testified that he ate sandwiches at the store twice a day and drank canned sodas, and was told that he could have them for free. (Vivaldo: Tr. 43-44).

Vivaldo would make 20 deliveries per day during the week and about 25 per day on the weekends, with each delivery taking "six or ten minutes." (Vivaldo: Tr. 40). Sometimes he would make multiple deliveries at once, which would take 25 to 40 minutes. (Vivaldo: Tr. 40-41). In addition to his duties as a delivery person, Vivaldo "dealt with sodas . . . [brought] ice bags, and [took] out the garbage," and cleaned. (Vivaldo: Tr. 27, 43). He estimated that these non-delivery tasks took him five or six hours per day, which he performed while he waited to make deliveries. (Vivaldo: Tr. 31). However, on cross-examination he testified that the five-hour figure was actually the total time spent by him and his coworker, Pedro. (Vivaldo: Tr. 41-43).

### 3. Ibrahim Alzubairy

Alzubairy was the owner and sole shareholder of 106 Columbia Deli Corp. from December 2010 until he sold the business in June 2015. (Alzubairy: Tr. 48-49). He was responsible for the finances of the business, including the filing of corporate tax returns and quarterly sales returns. (Alzubairy: Tr. 50). His business's gross receipts were $214,011 from December 2010 to November 2011; $289,372 from December 2011 to November 2012; $320,375 from December 2012 to November 2013; and $374,461 from December 2013 to November 2014. (Alzubairy: Tr. 53, 55).

Alzubairy worked at Columbia Deli "10, 12, 14 [hours] on the weekend if they need me to stay" but was at the store "mostly during the day." (Alzubairy: Tr. 56-57). He hired employees, paid employees, and told employees what to do — including Vivaldo and Salustio.

(Alzubairy: Tr. 57-58). Alzubairy kept written records for his employees which listed how much he paid them, the dates and how many hours they worked, and how much time they took for meal breaks. (Alzubairy: Tr. 57, 59). He explained that he would write down on a sheet of paper the time that an employee came to work, and would keep using that piece of paper until Saturday. (Alzubairy: Tr. 99-100). On Saturday he would then transfer what was written on that paper to an "employee time sheet" and throw out the piece of paper. (Alzubairy: Tr. 100). These employee time sheets were admitted into evidence. Alzubairy: Tr. 59-60; 65; see also Exs. B & C (time records for Salustio and Vivaldo).

Using the employee time sheet records, Alzubairy testified that Salustio worked about 54 hours per week when he started, and was paid a regular rate of $8.50 per hour and an overtime rate of $12.75 per hour. (Alzubairy: Tr. 59-60). At some point Alzubairy gave Salustio a raise, paying him $10 per hour regular rate and $15 per hour overtime rate. (Alzubairy: Tr. 60). He said that he was there "most of the time" when Salustio left for the day, and that Salustio never worked more than nine hours a day or 54 hours per week. (Alzubairy: Tr. 60-61). Alzubairy also saw Salustio take a 30-minute break each day and eat lunch and dinner at the deli, for which he did not have to pay. (Alzubairy: Tr. 61).

Alzubairy also testified that Salustio would "leav[e] a lot and com[e] back." (Alzubairy: Tr. 62). He said that Salustio would

> get mad if he had a problem with a customer. . . . [F]or a small reason[ ], he [would] leave his job. If he fight with a customer for one sandwich mistake, that's it, I'm not working, or the next day never show up. . . . I feel sorry for him, and I know, like, he['s] not doing that, like, on purpose. So he quit or the next day he don't show up and go for a month, and after that come back to his job.

(Alzubairy: Tr. 63). This happened "three, four . . . or five" times, for three months or more. (Alzubairy: Tr. 96). Alzubairy would rehire Salustio when he returned (Alzubairy: Tr. 63-64) and the records reflect these periods where Salustio was absent (Alzubairy: Tr. 63).

As to Vivaldo, Alzubairy testified that even though the records said Vivaldo's shift was from 7:00 p.m. to 3:00 a.m., he actually worked until 4:00 a.m., or 54 hours per week. (Alzubairy: Tr. 65-66). Alzubairy did not have a clear explanation for why this mistake occurred, saying "I think it was in my mind to 3 and[ ] I started doing that all the time. That's a mistake. But the total, I was right in the total, in the pay, and I'm sorry for this mistake." (Alzubairy: Tr. 101-02).

Alzubairy paid Vivaldo $6 per hour for all hours worked. (Alzubairy: Tr. 66). He explained:

> I called my accountant. I spoke with one of his, what you call him, the payroll workers and ask[ed] him about delivery. I know it's different [from] the regular worker. In that time they told me [$]5.75, then I decided to give him [$]6. That's okay. So his hour pay was $6.

(Id.). He said that his accountant "didn't tell [him] about the overtime for the delivery boy" and he thought he was properly paying Vivaldo because "$6, plus they making a lot of tip and they [were] doing good with the tip." (Id.). He also said that his accountant never told him anything about written notices, including for tip credits. (Alzubairy: Tr. 66-67). He said that he consulted with "payroll persons" once, and did not do anything else to determine the requirements for paying delivery workers. (Alzubairy: Tr. 73-74). He did not specifically know the payroll person's background in wage and hour laws, but believed the person gave him competent advice because as an "account office" and "as an office for employees, they know, they should know." (Alzubairy: Tr. 88-89).

8

Alzubairy knew that Vivaldo made $70-80 in tips each day because of "the records of the GrubHub, online they have three companies" that would report tips. (Alzubairy: Tr. 69). Alzubairy's cashiers would pay out Vivaldo's tips from these services. (See Alzubairy: Tr. 67). Vivaldo never worked more than nine hours a day, and Alzubairy never paid Vivaldo more than $6 an hour. (Alzubairy: Tr. 69). Alzubairy admitted that "I didn't pay [Vivaldo] for the extra hours. I didn't know that for delivery boy you have to do that." (Alzubairy: Tr. 73).

Alzubairy said that he was at the store during Vivaldo's shift, though not usually until the end. (Alzubairy: Tr. 67). He was sometimes there when Vivaldo took a meal break, but not always. (Id.). Alzubairy would observe Vivaldo performing 30 to 40 minutes of nondelivery work such as cleaning the floor outside and fixing "a little bit [of] soda." (Alzubairy: Tr. 74). He had regular conversations with Vivaldo about pay and hours, beginning when Vivaldo started working. (Alzubairy: Tr. 67-68). He said that Vivaldo never complained about his hours or his pay, and "when he quit and go and work with anybody else, he [would] come back to the store because [Alzubairy] was treating him very nice." (Alzubairy: Tr. 68). He also said that he would not reduce Vivaldo's hours just because he came late. (Alzubairy: Tr. 89-90).

On cross-examination Alzubairy admitted that he never gave Salustio or Vivaldo any kind of documentation indicating their rate of pay when they started, but instead "spoke with them." (Alzubairy: Tr. 93). He did not give them any kind of written statements or documents along with their pay. (Alzubairy: Tr. 94). He did not use any kind of "clock in and clock out" system or any log that plaintiffs would have to sign when they came to and left work, "because [the plaintiffs had a] fixed schedule." (Alzubairy: Tr. 84-85). He also testified that he "never charge[d] them for" meal times — in other words, plaintiffs were still paid for their half-hour meal breaks. (See Alzubairy: Tr. 86).

Alzubairy admitted that he did not "have any proof or evidence that [he] actually made [the time] records at the same time" that plaintiffs worked for Columbia Deli, but said that he knew they were accurate because he was "doing it every week." (Alzubairy: Tr. 90). He said: "To the end of the week I write down this, this, everything." (Alzubairy: Tr. 90). He also testified that, if he did not have records for a month for Salustio, "it means he didn't work that month." (Alzubairy: Tr. 91).

C. Documents

Defendants introduced into evidence the tax returns for Columbia Deli, which corroborated Alzubairy's testimony as to the deli's annual gross receipts. Ex. A; see Alzubairy: Tr. 51-56. The returns show gross sales receipts of $214,011 for the deli's tax year from December 2010 to November 2011; $289,372 from December 2011 to November 2012; $320,375 from December 2012 to November 2013; and $374,461 from December 2013 to November 2014. Ex. A at D1, D8, D24, D36. Alzubairy testified that there was a mistake in the returns, in that the rent that the business paid each month was listed as lower than the store actually paid each month, but that it did not affect the gross income number listed on the returns. (Alzubairy: Tr. 55-56).

The time sheet records for Salustio and Vivaldo were also admitted into evidence. See Exs. B & C; Alzubairy: Tr. 60, 65. Alzubairy noted that these records reflected certain weeks where Salustio and Vivaldo worked less than 54 hours (see Alzubairy: Tr. 70-72), or where Salustio had returned to work after an absence (see Alzubairy: Tr. 70-71).

The records reflect gaps in Salustio's work record, as well as days where he did not show up for work, see, e.g., Ex. B at D64, D69, D74, but generally show 40 hours of regular time and 14 hours of overtime worked per week, from 7:00 a.m. to 4:00 p.m., with a half-hour break for a

meal, see, e.g., id. at D58, D65, D82.  They show a pay rate of $8.50 per hour and an overtime

rate of $12.75 per hour from January 2011 to December 2011, see, e.g., id. at D76, and a rate of

$10 per hour with an overtime rate of $15 per hour from January 2012 until June 2014, see, e.g.,

id. at D55.[4]

The records for Vivaldo reflect days when he was absent.  E.g. Ex. C at D88.  They

generally reflect work from 7:00 p.m. to 3:00 a.m. and a listed total hours worked of 54, all paid

at the rate of "$6.00 in hour + tips," from May 20, 2013, to March 29, 2014, see, e.g., id. at D95.

They do not reflect any overtime ever being paid.  See, e.g., id.

Also received into evidence was a store menu from the Yelp website, dated March 21,

2017, which showed the type of items Columbia Deli sold and their prices.  Ex. D; see also

Alzubairy: Tr. 76.

D.  Findings on Disputed Issues of Fact

The Court finds that Columbia Deli's annual gross receipts were less than $500,000 from

December 2010 through November 2014.  The tax returns received into evidence showed less

than $500,000 annual income for each calendar year at issue.  Ex. A; see Alzubairy: Tr. 53-55.

Salustio's assertion that he watched the cashier count the day's receipts each day and that it

regularly totaled $4,000 (Salustio: Tr. 22, 24-25) was not credible.

As for hours worked, we begin by noting that we found some of Salustio's testimony

incredible.  Most obviously, Salustio initially testified that he never took a vacation, worked at

Columbia Deli "continuously," always worked 60 hours per week, and never took a break during

---

[4]  For some weeks, the hourly pay rates for overtime are written at the top of the sheet but
do not match the total weekly payment made to the employee.  E.g. D56, D63.  We have
assumed for those weeks that the employee's overtime rate is the rate that is reflected in the total
weekly payment.

the work day. (Salustio: Tr. 6-7, 17). Later, he changed his testimony to admit he ate lunch or dinner in the store (Salustio: Tr. 17) and — more significantly — that he regularly left his work at Columbia Deli at 1 p.m. "to help [his] brother-in-law," (Salustio: Tr. 19). This sudden change in testimony made Salustio far less believable than Alzubairy, who provided records that corroborated Salustio's admission that he left early some days. E.g. Ex. B. at D78. The records also corroborated Alzubairy's believable testimony (see Alzubairy: Tr. 71) that Salustio did not show up for work at all on some days, see, e.g., id. at D64.

While Salustio testified that he was paid $10 per hour continuously from December 2010 onward (Salustio: Tr. 7), the records show Salustio was paid at a lower rate in 2011 than he claimed: $8.50 as a base rate, and $12.75 for overtime. E.g. Ex. B at D78. Given that defendants had no incentive to create a record showing a lower rate of pay than what Salustio was actually receiving, this supports our view that the records are accurate.

We recognize that the records contain gaps of many months without a time sheet. But Alzubairy's explanation that Salustio often left work for extended periods and then returned (see, e.g., Alzubairy: Tr. 62-63) is more credible than Salustio's testimony, which did not admit that he ever missed any work. Further, at least one time sheet specifically notes that Salustio had returned from an extended absence. See Ex. B at D74 (indicating the week ending December 17, 2011, as the first day Salustio returned to work).

Accordingly, we find that Alzubairy's attestation to the accuracy of the employee time records is more credible than Salustio's (or, described next, Vivaldo's) testimony. While the time records give the visual impression that each was created on the same day, and each has similarities to the time record of the previous week, Alzubairy explained to the Court that he would track the hours in different sheets during the week, then record the hours on a new sheet

12

of paper at the end of the work week.  (See Alzubairy: Tr. 97-101).  This also explains the error in Vivaldo's time sheets, which indicate that Vivaldo left work at 3:00 a.m. even though they show he worked 54 hours per week.  E.g. Ex. C at D83.  As Alzubairy clarified, Vivaldo actually worked until 4:00 a.m.  (See Alzubairy: Tr. 65, 101-02).

Plaintiffs argue that they are entitled to "burden shifting" on the issue of their hours because the records defendants maintained do not comply with the FLSA or the NYLL's standards as set forth in regulations, including, for example, maintaining a record with the address and social security number of the employee.  See Pls. Post-trial Mem. at 8 (citing N.Y. Comp. Codes R. & Regs. tit. 12, § 146-2.1(a)).  They cite to Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687-88 (1946), to argue that "[w]here an employer . . . fails to keep adequate records . . . [p]laintiffs' testimony at trial satisfie[s]" the burden of proof.  See Pls. Post-trial Mem. at 10-11.  But Anderson held only that "[w]hen the employer has kept proper and accurate records the employee may easily discharge his burden by securing the production of those records."  Anderson, 328 U.S. at 687.  Anderson did not define what it means to keep "proper and accurate" records and did not hold that the employer can prove hours only by offering records that comply with all regulatory requirements.  The other case plaintiffs cite, Doo Nam Yang v. ACBL Corp., 427 F. Supp. 2d 327 (S.D.N.Y. 2005), is irrelevant because no admissible records were presented by the defendant in that case.  See id. at 332-33 & 332 n.5.

Here, defendants' records were received into evidence.  Even though the records do not comply with all requirements for time records as set forth in Federal or New York regulations, they still provide strong evidence as to the number of hours Salustio worked — evidence that we find to be far more credible than Salustio's testimony.

13

As for Vivaldo, we find that defendants' time sheets (with the amendment that he ended work at 4:00 a.m., not 3:00 a.m.) similarly provide a more reliable record than Vivaldo's testimony. While Vivaldo testified that he worked from 7:00 p.m. to 7:00 a.m. (Vivaldo: Tr. 27-28), Vivaldo's testimony was cursory and he made statements on cross-examination that defied credulity. On cross-examination, Vivaldo testified that he never discussed his hours or pay with Salustio, even though Salustio worked with him at the deli, was related to him by marriage, was living with him at the time he was employed at Columbia Deli, and is his co-plaintiff in this lawsuit. (Vivaldo: Tr. 32, 33, 36). He testified that he did not even know how much Salustio was paid. (Vivaldo: Tr. 35). Similarly, Vivaldo testified that he never discussed his hours or pay with his brother-in-law Raoul, who had gotten him the job at Columbia Deli, who also worked with him there, and with whom he was also living at the time he was employed at the deli. (Vivaldo: Tr. 34-36). He similarly asserted that he did not know how much Raoul was paid. (Vivaldo: Tr. 35). The incredible nature of this testimony caused the Court to discount Vivaldo's testimony as to his hours and rate of pay. Thus, we find that Vivaldo's testimony is less credible than Alzubairy's testimony on these points.

Based on Alzubairy's testimony, the Court credits defendants' records as accurate and complete as to the start and end dates of plaintiffs' employment, their hourly wages, and their hours worked in any given week. Thus, we find Salustio started working at Columbia Deli on January 10, 2011, and left permanently on June 7, 2014. He had gaps in employment from March 2, 2011, until December 14, 2011; from March 18, 2012, to September 10, 2012; from September 22, 2012, to April 8, 2013; from April 20, 2013, to October 14, 2013; and from November 2, 2013, to May 12, 2014. He was paid $8.50 per hour and $12.75 for overtime hours from January 2011 until December 30, 2011, then $10 per hour and $15 for overtime hours for

the remainder of his employment.  Unless a time sheet reflects otherwise, Salustio worked 54 hours each week, including a half-hour meal break each day, and was paid for 40 hours of work at his regular rate and 14 hours at the overtime rate.

Vivaldo started working at Columbia Deli on May 20, 2013, and left on March 29, 2014. He was paid $6 per hour plus tips for the entire period of his employment.  Unless a time sheet reflects otherwise, Vivaldo worked 54 hours each week, with a half-hour meal break each day, all of which were compensated at Vivaldo's regular $6 rate.

Because defendants admit that Vivaldo was not given notice of their intention to take a tip credit, it is unnecessary for the Court to determine how many hours of untipped work he performed per shift.

III.  DISCUSSION

A.  FLSA Claims

Defendants argue that because their sales volume was under $500,000 this Court lacks "original jurisdiction" to hear plaintiffs' FLSA claims under 28 U.S.C. § 1331, and that we should decline to exercise supplemental jurisdiction over plaintiffs' NYLL claims pursuant to 28 U.S.C. § 1367(a).  See Defs. Post-trial Mem. at 11.  To the extent that defendants are arguing that the Court lacks subject matter jurisdiction over plaintiffs' FLSA claim because the $500,000 threshold was not reached, the argument is rejected.  "Virtually all of the circuit courts and those district courts in the Second Circuit that have explicitly considered whether the FLSA's $500,000 requirement is jurisdictional agree that it is a requirement that goes to the merits of a claim and is not jurisdictional."  Angel v. Harvest C-Food Inc., 2015 WL 7288644, at *2 (S.D.N.Y. Nov. 16, 2015) (collecting cases); accord Torralba v. Little India Stores, 2016 WL 771192, at *3 (S.D.N.Y. Feb. 29, 2016); Shu Lan Chen v. Gypsophilia Nail & Spa Inc., 2015

15

WL 3473510, at *1 (S.D.N.Y. June 2, 2015); <u>Rocha v. Bakhter Afghan Halal Kababs, Inc.</u>, 44 F. Supp. 3d 337, 343-44 (E.D.N.Y. 2014). Thus, "any failure to prove that [an employer] earns $500,000 or more in gross annual sales would not divest the Court of subject matter jurisdiction. Instead, it would simply mean that plaintiff[s have] failed to meet [their] burden of proof on [their] FLSA-based claims." <u>Angel</u>, 2015 WL 7288644, at *3.

Turning to the merits of those claims, the FLSA's minimum wage and overtime requirements provide coverage to those "employees who . . . [are] engaged in commerce or in the production of goods for commerce, or [are] employed in an enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 206(a). "The two categories are commonly referred to as 'individual' and 'enterprise' coverage, respectively." <u>Jacobs v. N.Y. Foundling Hosp.</u>, 577 F.3d 93, 96 (2d Cir. 2009) (per curiam); <u>accord</u> <u>Xiao Dong Fu v. Red Rose Nail Salon</u>, 2017 WL 985893, at *5 (S.D.N.Y. Mar. 13, 2017).

"Individual coverage" applies to an employee who has "engaged in commerce or in the production of goods for commerce." <u>Boekemeier v. Fourth Universalist Soc. in City of N.Y.</u>, 86 F. Supp. 2d 280, 287 (S.D.N.Y. 2000) (internal quotation marks omitted (quoting 29 U.S.C. § 207(a)(1)). This type of coverage — which neither party argues applies — is implicated when "a substantial part of the employee's work [is] related to interstate commerce." <u>Id.</u> (internal quotation marks omitted) (quoting <u>Divins v. Hazeltine Elecs. Corp.</u>, 163 F.2d 100, 103 (2d Cir. 1947)); <u>accord</u> <u>Yupa v. Country Stone & Fence Corp.</u>, 2017 WL 27957, at *3 (E.D.N.Y. Jan. 3, 2017). Enterprise coverage, on the other hand, applies when an employer

> (I) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and

(ii) is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 . . . .

29 U.S.C. § 203(s)(1)(A).

Here, because the $500,000 threshold was not met, there is no "enterprise coverage" and plaintiffs' claims under the FLSA must be dismissed.  See, e.g., Ni Ping v. No. 1 Great Wall of Fulton 168, 2017 WL 1330323, at *4 (E.D.N.Y. Apr. 5, 2017) (granting defendants judgment as a matter of law on plaintiffs' FLSA claims where defendants' tax returns and back records established their gross annual revenue never exceeded $500,000); Yupa, 2017 WL 27957, at *5 (granting summary judgment for defendants when "no evidence [existed] that would permit a jury to conclude that [defendants] had gross revenues of at least $500,000 during the years of plaintiff's employment," and thus there was "no enterprise coverage").  Because the FLSA claims were the only federal claims in this action, and no other basis for jurisdiction has been alleged over the NYLL claims, we next consider whether we should continue to exercise supplemental jurisdiction over those claims.

B.  Jurisdiction Over NYLL Claims

28 U.S.C. § 1367(a) provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy."  The term "part of the same case or controversy" means that the claims "derive from a common nucleus of operative fact."  Briarpatch Ltd. v. Phoenix Pictures, Inc., 373 F.3d 296, 308 (2d Cir. 2004) (citation and internal quotation marks omitted).  It is well settled that NYLL and FLSA claims that arise out of the same compensation policies and practices derive from the same common nucleus of operative fact.  See Shahriar v. Smith &

17

Wollensky Rest. Grp., Inc., 659 F.3d 234, 245 (2d Cir. 2011); accord Yong Kui Chen v. Wai ?

Café Inc., 2017 WL 3311228, at *3 (S.D.N.Y. Aug. 2, 2017) ("In wage and hour cases, typically,

supplemental jurisdiction is appropriate for NYLL claims during the employment relationship

because those claims arise from the same underlying factual basis as FLSA claims.") (citations,

brackets, and internal quotation marks omitted).  If the statutory requirements for supplemental

jurisdiction are satisfied, "discretion to decline supplemental jurisdiction is available only if

founded upon an enumerated category of subsection 1367(c)."  Shahriar, 659 F.3d at 245

(emphasis in original) (internal quotation marks omitted) (quoting Itar-Tass Russian News

Agency v. Russian Kurier, Inc., 140 F.3d 442, 448 (2d Cir. 1998)).

The only potentially relevant provision in 28 U.S.C. § 1367(c) is subsection (3), which

provides that a district court may decline to exercise supplemental jurisdiction if "the district

court has dismissed all claims over which it has original jurisdiction."  The Second Circuit has

ruled that in such a situation, "a district court should not decline to exercise supplemental

jurisdiction unless it also determines that doing so would not promote the values articulated in

[United Mine Workers of America v.] Gibbs, [383 U.S. 715, 726 (1966)]: economy,

convenience, fairness, and comity."  Jones v. Ford Motor Credit Co., 358 F.3d 205, 214 (2d Cir.

2004); accord Shahriar, 659 F.3d at 245; Fixed Income Shares: Series M v. Citibank N.A., 130

F. Supp. 3d 842, 852 (S.D.N.Y. 2015).

Here, at least three of the Gibbs factors counsel against dismissing plaintiffs' NYLL

claims.  It would be grossly inefficient to retry the NYLL claims with the identical evidence in

state court.  It would be inconvenient to both sides.  It would also be fundamentally unfair to

require the parties to undergo the expense of a duplicative trial.[5]  While defendants correctly

point to case law in which courts have dismissed state law claims when federal claims are

dismissed, see Defs. Post-trial Mem. at 17; Defs. Post-trial Reply at 3, none of these cases

involved claims that had actually proceeded to trial.  Rather, they involved dismissals of federal

claims following a motion to dismiss for failure to state a claim or on a motion for summary

judgment.  Thus, the common articulation of the rule on dismissal of state law claims

specifically excludes dismissals that occur after trial.  See, e.g., Marcus v. AT&T Corp., 138

F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the

state claims should be dismissed as well.") (emphasis added).  In Purgess v. Sharrock, 33 F.3d

134 (2d Cir. 1994), the Second Circuit upheld a district court's exercise of supplemental

jurisdiction in a case where a trial had occurred because "it would have been wasteful to subject

[the] case to another full trial before a different tribunal."  Id. at 139.  Purgess noted that when

"the dismissal of the federal claim occurs late in the action, after there has been substantial

expenditure in time, effort, and money in preparing the dependent claims, knocking them down

with a belated rejection of supplemental jurisdiction may not be fair.  Nor is it by any means

necessary."  Id. (citation and internal quotation marks omitted); accord Motorola Credit Corp. v.

Uzan, 388 F.3d 39, 56-57 (2d Cir. 2004) (upholding retention of supplemental jurisdiction where

all federal claims were dismissed following a bench trial).  Indeed, as noted in Motorola, 388

---

[5]  We share defendants' concern that a plaintiff should not be rewarded for lightly making
allegations of enterprise coverage under the FLSA in order to have a NYLL claim heard in a
federal court.  See generally Defs. Post-trial Reply at 4.  The best approach to countering such a
circumstance, however, is to seek summary judgment on enterprise coverage if there is no
genuine dispute of fact.  In cases where there is such a factual dispute, a district court may be
open to holding a trial limited to the issue of enterprise coverage — particularly where the
parties have consented to a bench trial.

F.3d at 56, the Second Circuit has upheld the retention of supplemental jurisdiction where far fewer resources had been expended. See Ametex Fabrics, Inc. v. Just In Materials, Inc., 140 F.3d 101, 105-06 (2d Cir. 1998) (district court did not abuse its discretion in exercising supplemental jurisdiction after discovery and a settlement conference had taken place).[6]

The Court thus will continue to exercise supplemental jurisdiction over plaintiffs' NYLL claims.

C. Merits of the NYLL Claims

1. Minimum Wage and Overtime Claims

Under New York law, employers had to pay employees a minimum wage rate of $7.25 per hour in the period from July 24, 2009, through December 30, 2013, and $8 per hour in the period from December 31, 2013, to December 30, 2014. NYLL § 652; N.Y. Comp. Code R. & Regs. tit. 12, § 146-1.2 (effective Dec. 31, 2013, to Dec. 30, 2015); see also Pretrial Order at 10. New York law also requires that all hours worked above 40 per week must be paid at one-and-one-half times the regular hourly rate. N.Y. Comp. Codes R. & Regs. tit. 12, §§ 142-2.2, 146-1.4.

a. Salustio

From January 2011 to December 30, 2011, Salustio was paid $8.50 per hour up to 40 hours, then $12.75 for "overtime hours" worked after that. See, e.g., Ex. B at D82. Although

---

[6] We are aware of the case of Rana v. Bismallah Gyro Inc., 2017 WL 1390666 (E.D.N.Y. Apr. 17, 2017), which declined to exercise supplemental jurisdiction over NYLL claims after a bench trial on both the FLSA and the NYLL claims. Both parties were pro se in that matter and the trial court's ruling relied on the fact that "[p]laintiff ha[d] not provided a reason for [the] Court to preside over his state claims." Id. at *7. Further, Rana contains no analysis of the Gibbs factors as required by Second Circuit case law. Thus, we decline to follow Rana.

this entitled him to $518.50 when he worked his regular 54 hours, his pay was often rounded up to $520.  See, e.g., id. at D77.  For all dates he worked at Columbia Deli from January 1, 2012, until he left his employment there in 2014, he was paid $10 per hour up to 40 hours, then $15 per hour after that, receiving $610 during weeks where he worked a full 54-hour schedule.  See, e.g., id. at D70.

Because we have accepted defendants' records as an accurate reflection of how much Salustio was paid and how many hours he worked, we find that Salustio was paid a wage either equal to or greater than the minimum wage rate for his period of employment.  Also, Salustio was compensated for every hour that he worked at Columbia Deli.  Accordingly, defendants are not liable to Salustio for minimum wage or overtime pay.

b. Vivaldo

Accepting defendants' records as true, Vivaldo was paid $6 per hour plus tips from May 20, 2013, until he stopped working at Columbia Deli in March 2014, and was paid the same wage for his overtime hours.  See, e.g., Ex. C at 127.  Indeed, defendants concede that Vivaldo was paid at a "reduced minimum wage" for all hours worked, based on their use of a "tip credit," and that he was not paid overtime.  See Defs. Post-trial Mem. at 9-10.

As for the use of the "tip credit," under New York law, a service employee or food service worker may be paid at a rate lower than the statutory minimum wage, provided two conditions are met: (1) the employee must receive enough tips to meet a statutory minimum, and (2) the employee must be notified that he or she is being paid at this lower rate (called a "tip credit") as required by regulation.  N.Y. Comp. Codes R. & Regs. tit. 12, § 146-1.3.  The notice must be in writing and must state

the employee's regular hourly pay rate, overtime hourly pay rate, the amount of tip credit, if any, to be taken from the basic minimum hourly rate, and the regular payday. The notice shall also state that extra pay is required if tips are insufficient to bring the employee up to the basic minimum hourly rate.

Id. § 146-2.2; accord Inclan v. N.Y. Hosp. Grp., Inc., 95 F. Supp. 3d 490, 498 (S.D.N.Y. 2015). The employer must also, in almost all cases, provide the notice in both English and in the employee's primary language. N.Y. Comp. Codes R. & Regs. tit. 12, § 146-2.2. An employer who fails to provide the required notice is liable for the difference between the full minimum wage rate and what the employee was actually paid. Inclan, 95 F. Supp. 3d at 498 (applying NYLL). "The burden is on the defendants to show that they have complied with the tip notice requirement." Valle v. Gordon Chen's Kitchen LLC, 2017 WL 2438571, at *6 (S.D.N.Y. June 6, 2017) (citing N.Y. Comp. Codes R. & Regs. tit. 12, § 146-2.2(d) ("The employer has the burden of proving compliance with the notification provisions of [the NYLL]."); and Villar v. Prana Hosp., Inc., 2017 WL 1333582, at *3 n.4 (S.D.N.Y. Apr. 11, 2017)).

Here, defendants never provided Vivaldo with any notice, written or otherwise, that tips he received would be used to fulfill defendants' obligations to pay him a minimum wage. (See Vivaldo: Tr. 30-31; Alzubairy: Tr. 94). Accordingly, defendants are liable to Vivaldo for the difference between what he was paid each week and New York's minimum wage rates for 2013 and 2014; that is, $7.25 per regular hour and $10.88 per overtime hour from May 20, 2013, to December 30, 2013, and $8 per regular hour and $12 per overtime hour from December 31, 2013, until March 29, 2014.

Based on defendants' records, Vivaldo worked 1,285 hours of regular time and 416 hours of overtime from May 20, 2013, to December 30, 2013, and 520 hours of regular time and 173

hours of overtime from December 31, 2013, to March 29, 2014.  Thus, Vivaldo's unpaid wages are as follows:

Straight time 2013: (7.25 - 6) x 1,285 = $1,606.25

Overtime 2013: (10.88 - 6) x 416 = $2,030.08

Straight time 2014: (8-6) x 520 = $1,040

Overtime 2014: (12-6) x 173 = $1,038

Total unpaid wages: $5,714.33.[7]

## 2. NYLL Notices

The NYLL requires that an employer provide wage statements and wage notices to each employee.  See NYLL § 195(1), (3).  NYLL section 195(1) requires that, both at the time of hiring and annually through December 28, 2014, an employer "provide his or her employees, in writing in English and in the language identified by each employee as [their] primary language," notice of

> the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; the regular pay

---

[7]  Defendants seek to deduct from Vivaldo's hours time spent during his meal break. See  Defs. Post-trial Mem. at 26-27.  They also seek to charge Vivaldo for the cost of the meal as is permitted by N.Y. Comp. Codes R. & Regs. tit. 12, § 146-1.9(a).  See Defs. Post-trial Mem. at 26-27.  Alzubairy made clear during his testimony, however, that he had a policy of not deducting the time spent on a meal break and not charging for meals.  (See Alzubairy: Tr. 62 (Alzubairy told Salustio "I'm not going to charge him" for meals); id. 86 ("I never charge them for that time of the meal . . . ."); id. at 89 ("I don't charge for meals.  I don't charge for hours.")).  Defendants do not explain why they should be permitted to retroactively change the terms of Vivaldo's compensation arrangement merely because they failed to comply with statutory minimum wage requirements.  Additionally, any request for a meal credit must be denied, as defendants have not met their burden of showing that the meals provided met the requirements of the regulation as to nutritional content.  For example, no one testified that coffee, tea, milk, or juice was available to plaintiffs as required by the regulation.  See N.Y. Comp. Codes R. & Regs. tit. 12, § 146-3.7(a).

> day designated by the employer in accordance with section one hundred
> ninety-one of this article; the name of the employer; any "doing business as"
> names used by the employer; the physical address of the employer's main office
> or principal place of business, and a mailing address if different; the telephone
> number of the employer; plus such other information as the commissioner deems
> material and necessary.

Id. § 195(1)(a); accord Franco v. Jubilee First Ave. Corp., 2016 WL 4487788, at *13 (S.D.N.Y. Aug. 25, 2016). The notice must also state an employee's regularly hourly rate and overtime rate of pay. NYLL § 195(1)(a). Under the statute in effect when plaintiffs filed suit, statutory damages of $50 per workday, not to exceed $2,500, may be assessed for failure to comply with this provision. See id. § 198(1-b) (effective Apr. 9, 2011, to Feb. 26, 2015). However, this provision permits an employee to bring a private right of action for damages only when the "employee is not provided [the notice] within ten days of his or her first day of employment." Id.; accord Guan Ming Lin v. Benihana N.Y. Corp., 2012 WL 7620734, at *7 (S.D.N.Y. Oct. 23, 2012). Because this provision did not take effect until April 9, 2011, an employee who began working before that date is not entitled to bring a claim for failure to provide wage statements. See Franco, 2016 WL 4487788, at *13 (collecting cases).

> NYLL section 195(3) requires that employers
>
> furnish each employee with a statement with every payment of wages, listing the
> following: the dates of work covered by that payment of wages; name of
> employee; name of employer; address and phone number of employer; rate or
> rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary,
> piece, commission, or other; gross wages; deductions; allowances, if any, claimed
> as part of the minimum wage; and net wages.

NYLL § 195(3). The statements must also include, where applicable, the employee's "regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked." Id. The statute in effect when plaintiffs commenced this action required an award of damages of $100 per work week that a violation

occurred, not to exceed $2,500.  <u>See</u> NYLL § 198(1-d) (effective Apr. 9, 2011, to Feb. 26, 2015).

It is undisputed that defendants never provided plaintiffs with the required pay notices or the required pay stubs.  <u>See</u> Pls. Post-trial Mem. at 18; Defs. Post-trial Mem. at 31.  However, because Salustio began working for defendants on January 10, 2011, before NYLL section 195(1)(a) took effect, <u>see</u> Ex. B at D82, he cannot recover for violations of section 195(1). Vivaldo can recover under this section, however, and the Court finds it appropriate to award him $2,500.  Both plaintiffs are entitled to recover $2,500 for the violation of section 195(3).  Thus Vivaldo is awarded statutory damages of $5,000 and Salustio is awarded $2,500.

### 3. Spread of Hours Pay

Plaintiffs argue that they are also owed "spread of hours damages."  Pls. Post-trial Mem. at 17.  New York law requires, separate from any unpaid minimum wage or overtime award, that "an employee whose workday is longer than ten hours must receive one hour's pay at the basic minimum hourly wage rate."  <u>Galeana v. Lemongrass on Broadway Corp.</u>, 120 F. Supp. 3d 306, 319 (S.D.N.Y. 2014) (internal quotation marks omitted) (quoting N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.4; and <u>Ke v. Saigon Grill, Inc.</u>, 595 F. Supp. 2d 240, 260 (S.D.N.Y. 2008)).  This time is measured as "the interval between the beginning and end of an employee's workday." N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.18; <u>accord</u> <u>Martinez v. Hilton Hotels Corp.</u>, 930 F. Supp. 2d 508, 531 (S.D.N.Y. 2013).  Thus, breaks, lunch periods, "split shifts,"[8] and other non-working time on premises count as part of the "workday" for this provision's requirements. N.Y. Comp. Codes R. & Regs. tit. 12, §§ 142-2.4, 142-2.18.

---

[8] "A split shift is a schedule of daily hours in which the working hours required or permitted are not consecutive," and where the "split" is greater than one hour.  N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.17 (emphasis omitted).

Salustio worked from 7:00 a.m. to 4:00 p.m. (a shift of nine hours), and Vivaldo worked

from 7:00 p.m. to 4:00 a.m. (a shift of nine hours), including a break for meals. Because neither

plaintiff worked a split shift or worked a shift longer than 10 hours, they are not entitled to

"spread of hours" pay.

### 4. Liquidated Damages

Vivaldo seeks liquidated damages for his unpaid wage award. New York Labor Law

§ 198(1-a) provides in pertinent part:

> In any action instituted in the courts upon a wage claim by an employee . . . in
> which the employee prevails, the court shall allow such employee to recover the
> full amount of any underpayment [of wages], all reasonable attorney's fees,
> prejudgment interest as required under the civil practice law and rules, and, unless
> the employer proves a good faith basis to believe that its underpayment of wages
> was in compliance with the law, an additional amount as liquidated damages
> equal to one hundred percent of the total amount of the wages found to be due.

NYLL § 198(1-a) (effective Apr. 9, 2011, to Feb. 26, 2015). The NYLL's liquidated damages

provision mirrors the provision in the FLSA, and courts in this circuit have found no substantive

difference between the two standards in their definition of "good faith." See Luna v. Gon Way

Constr., Inc., 2017 WL 835321, at *13-14 (E.D.N.Y. Feb. 14, 2017); Garcia v. Bad Horse Pizza,

Inc., 2017 WL 192955, at *3 & n.3 (S.D.N.Y. Jan. 18, 2017); Inclan, 95 F. Supp. 3d at 504-05.[9]

Thus, "[t]o establish the requisite subjective 'good faith,' an employer must show that it took

active steps to ascertain the dictates of the [FLSA or NYLL] and then act to comply with them."

Barfield v. N.Y.C. Health & Hosps. Corp., 537 F.3d 132, 150 (2d Cir. 2008) (internal quotation

marks omitted) (quoting Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 142 (2d Cir. 1999)).

---

[9] The FLSA standard differs, however, by requiring not only a showing of good faith but also of "objective reasonableness." See, e.g., Reich v. So. New Eng. Telecomms. Corp., 121 F. 3d 58, 71 (2d Cir. 1997); accord Galeana, 120 F. Supp. 3d at 317.

The burden is on the employer to prove that it acted in good faith.  See Khan v. Party Pizza Inc., 2016 WL 4597479, at *4 (E.D.N.Y. Aug. 16, 2016); Spicer v. Pier Sixty LLC, 2011 WL 446144, at *3 (S.D.N.Y. Feb. 7, 2011).

At trial, Alzubairy testified that he paid Vivaldo $6 per hour on the advice of his "accountant."  (Alzubairy: Tr. 66).  He explained:

> I called my accountant.  I spoke with one of his, what you call him, the payroll workers and ask[ed] him about delivery.  I know it's different [from] the regular worker.  In that time they told me [$]5.75, then I decided to give him [$]6.  That's ok.  So his hour pay was $6.

(Id.).  Alzubairy said that the person he consulted with did not tell him that he had to pay delivery persons a higher rate for overtime, nor that he had to give Vivaldo a written notice about a tip credit.  (Alzubairy: Tr. 66-67).  He seemed to believe that the rate he paid complied with the law because "[delivery workers were] making a lot of tip[s] and they [were] doing good with the tip[s]."  (Alzubairy: Tr. 66).  On cross-examination, Alzubairy reiterated that when he called his accountant he was passed on to "the payroll labor, payroll worker."  (Alzubairy: Tr. 88).  He testified that he "ask[ed] him for delivery boy, what should I do?  They told me [$]5.75. I decided to pay him [$]6, but I didn't know about the overtime."  (Id.).  When asked whether he knew if the people he consulted "had any background in wage and hour laws," Alzubairy responded that "[y]es, as an office for employees, they know, they should know."  (Alzubairy: Tr. 89).

Alzubairy's explanation of his conversation with his accountant was sparse and lacking in detail.  There was no information or documentation provided as to who these individuals were and how they held themselves out to the public.  In the absence of such evidence, the Court cannot find that the defendants have met their burden of showing that they acted with subjective

good faith. The requirements of paying overtime are so well known that the Court cannot believe that Alzubairy's conversation with a "payroll worker" at an accountant's office would have been enough to actually convince Alzubairy that the law did not require him to pay an overtime wage to a tipped worker and that he did not need to keep a record of his employees' tips or give any explanation to this employee of what he was doing as to the minimum wage.

Because we find that defendants did not prove that they had a good faith basis to believe they were in compliance with the NYLL, Vivaldo is entitled to liquidated damages of 100% of his $5,714.33 in unpaid wages.

D. Prejudgment Interest

A plaintiff who prevails on a NYLL wage claim is entitled to prejudgment interest on any "underpayment" of wages. See NYLL § 198(1-a); Schalaudek v. Chateau 20th St. LLC, 2017 WL 729544, at *10 (S.D.N.Y. Feb. 24), modified and adopted by 2017 WL 1968677 (S.D.N.Y. May 11, 2017); Santana v. Latino Express Rests., Inc., 198 F. Supp. 3d 285, 294 (S.D.N.Y. 2016); Castillo v. RV Transport, Inc., 2016 WL 1417848, at *3 (S.D.N.Y. Apr. 11, 2016). Prejudgment interest is not available for violations of the wage statement or wage notice provisions. See NYLL § 198(1-b), (1-d); Schalaudek, 2017 WL 729544, at *8-11 (awarding prejudgment interest on unpaid wages and overtime, but not on statutory damages for notice violations). Also, the award of prejudgment interest applies only to the amount of underpayment of wages, not the liquidated damages. See Ortega v. JR Primos 2 Rest. Corp., 2017 WL 2634172, at *6 (S.D.N.Y. June 16, 2017) ("Prejudgment interest is available on actual damages awarded under the NYLL, but not on liquidated damages.") (citing Xochimitl v. Pita Grill of Hell's Kitchen, Inc., 2016 WL 4704917, at *18 (S.D.N.Y. Sept. 8, 2016)); accord Qui Hua Tan v. Voyage Express Inc., 2017 WL 2334969, at *8 (E.D.N.Y. May 25, 2017).

Prejudgment interest in New York runs at the rate of nine percent per annum. N.Y. C.P.L.R. 5001(a), 5004. The starting date from which a court computes this interest is "the earliest ascertainable date the cause of action existed." Conway v. Icahn & Co., 16 F.3d 504, 512 (2d Cir. 1994) (quoting N.Y. C.P.L.R. 5001(b)). However, "[w]here such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." N.Y. C.P.L.R. 5001(b); see also Marfia v. T.C. Ziraat Bankasi, 147 F.3d 83, 91 (2d Cir. 1998) ("New York law leaves to the discretion of the court the choice of whether to calculate prejudgment interest based upon the date when damages were incurred or 'a single reasonable intermediate date' . . . .") (quoting 155 Henry Owners Corp. v. Lovlyn Realty Co., 231 A.D.2d 559, 560-61 (2d Dep't 1996)).

Here, Vivaldo's claims for unpaid wages arose on different dates from May 20, 2013, to March 29, 2014. The midpoint of these dates is October 24, 2013. We elect to use this date to award Vivaldo prejudgment interest for the wage portion of his award. He is therefore entitled to nine percent annual interest on his unpaid wages damages of $5,714.33 from October 23, 2013, until the date judgment is entered, or $1.41 per day ($5,714.33 times .09 divided by 365).

## IV. CONCLUSION

For the foregoing reasons, plaintiff Ruben Salustio shall have judgment against defendants 106 Columbia Deli Corporation and Ibrahim Alzubairy in the amount of $2,500. Plaintiff Arturo Vivaldo shall have judgment against defendants 106 Columbia Deli Corporation and Ibrahim Alzubairy in the amount of $16,428.66, plus prejudgment interest at $1.41 per day

starting October 23, 2013, until the date judgment is entered. The Clerk is requested to enter

judgment accordingly.[10]

        SO ORDERED.

Dated: August 29, 2017
       New York, New York

                             GABRIEL W. GORENSTEIN
                             United States Magistrate Judge

---

[10] Any application for costs or attorney's fees may be filed within the time limits
provided by Fed. R. Civ. P. 54(d)(2)(B)(i).